## O'NEILL v. GENERAL FILM CO.

(Supreme Court, Appellate Division, First Department. March 17, 1916.)

1. LITERARY PROPERTY ⊂⇒9—SUIT FOR INJUNCTION—EVIDENCE—INFRINGEMENT.

In suit to enjoin the exhibition of motion picture representations of the dramatization of a novel, evidence *held* to show that the pictures were based on the dramatization, and not on the novel.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8; Dec. Dig. ⊂⇒9.]

2. LITERARY PROPERTY ⊂⇒5—"DEDICATION TO PUBLIC"—FILING COPY TO PROCURE LICENSE.

The filing of a copy of a play in England, as required by statute, to secure license to present it, is not a dedication of the play to the public.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⊂⇒5.

For other definitions, see Words and Phrases, First and Second Series, Dedication.]

3. LITERARY PROPERTY ⊂⇒5—DEDICATION TO PUBLIC—NEWSPAPER ACCOUNTS.

Newspaper accounts of the presentation of a play cannot constitute a dedication by the owner thereof to the public.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⊂⇒5.]

4. LITERARY PROPERTY ⊂⇒5—DEDICATION TO PUBLIC—FOREIGN COPYRIGHT.

Where a play is copyrighted in a foreign country, the law there requiring publication as condition precedent to copyright, it thereby is dedicated to the public in this country.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ⊂⇒5.]

5. LITERARY PROPERTY ⊂⇒5—DEDICATION TO PUBLIC—PERFORMANCE OF PLAY —FOREIGN LAW.

Where a play was not copyrighted in England, but was publicly performed there, and the statutes of that country declared such performance to be equivalent to a publication, and limited the dramatist's exclusive rights to the term of the copyright, the play, at the expiration of that term, is not dedicated to the public in this country, where a public per-

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

formance is not considered a publication, since otherwise the English law would be given effect in this country.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ☞5.]

6. LITERARY PROPERTY ☞9—TRANSFER—SUFFICIENCY OF EVIDENCE.

In suit to restrain publication of a motion picture reproduction of a play, evidence *held* sufficient to show plaintiff's ownership by assignment of the literary and performing rights to the play as against a stranger.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8; Dec. Dig. ☞9.]

7. LITERARY PROPERTY ☞3—OWNERSHIP—RIGHTS OF THEATER MANAGER.

The public performance of a play by the author confers no right to the play upon the manager of the theater in which it was performed.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 2; Dec. Dig. ☞3.]

8 ADVERSE POSSESSION ☞6—RIGHTS ACQUIRED—CHATTELS.

Title to a chattel may be acquired by adverse possession and claim of ownership.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 7–10, 12–23; Dec. Dig. ☞6.]

9. LITERARY PROPERTY ☞9—OWNERSHIP—EVIDENCE—POSSESSION OF MANU-SCRIPT.

Title to the manuscript of a play, while some evidence of ownership of the play, might be insufficient alone to establish such ownership.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8; Dec. Dig. ☞9.]

10. LITERARY PROPERTY ☞9—OWNERSHIP—EVIDENCE—MANUSCRIPT RECITALS.

Recitals of ownership and assignment of the rights to a play on the title page of a manuscript, made by one claiming to be assignee, are not competent evidence of the source of his title, but are competent to characterize the title which he claimed by virtue of the manuscript, and are some evidence of title to the play and the performing rights.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 8; Dec. Dig. ☞9.]

11. LITERARY PROPERTY ☞5—DEDICATION—EXHIBITION OF POSTERS.

The public posting of the posters containing photographs of the scenes of a play is not a publication of the play, which amounts to a dedication of it to the public.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ☞5.]

12. LITERARY PROPERTY ☞5—DEDICATION—COPYRIGHT.

Where the owner of the literary and performing rights in an uncopyrighted drama permits a motion picture representation thereof to be copyrighted, he parts with his common-law motion picture rights in the drama to the extent of the scenes represented by the copyrighted films, but not to scenes in the play not copyrighted in the films.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 4; Dec. Dig. ☞5.]

13. COPYRIGHTS ☞41, 42—DEDICATION—PUBLICATION FOR COPYRIGHT.

The publication of a book or play, in order to obtain a copyright, is a waiver of the author's common-law rights thereunder.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 40, 41, 48; Dec. Dig. ☞41, 42.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. COPYRIGHTS ☜36—MOTION PICTURE RIGHTS.

A copyright of a motion picture photoplay founded on a book or drama gives the owner thereof no exclusive right to the motion picture rights.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 37; Dec. Dig. ☜36.]

15. COPYRIGHTS ☜41, 42—WAIVER OF COMMON-LAW RIGHTS.

Copyrighting a translation of an unpublished play, the work of a foreign author, waives all the author's rights, except those preserved by the Copyright Law, and others may translate or dramatize the original work, provided they do not infringe upon the work in the copyrighted translation.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 40, 41, 48; Dec. Dig. ☜41, 42.]

16. COURTS ☜489(4)—INFRINGEMENT—DAMAGES.

In suit for injunction and damages for the infringement of the common-law rights to an unpublished drama by the exhibition of motion picture representations of it, where it appeared that the owner of the drama had permitted another to produce certain of its scenes in motion pictures, which were copyrighted, the state court cannot protect the rights based on the copyright; and where the federal courts have not determined what portion of the damages are due to the infringement of the common-law rights in the scenes not copyrighted, the state courts will refuse all damages subsequent to the issuance of the copyright.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1330; Dec. Dig. ☜489(4).]

Appeal from Special Term, New York County.

Action by James O'Neill against the General Film Company for injunction and damages. Judgment for the plaintiff (152 N. Y. Supp. 599), and defendant appeals. Modified and affirmed.

Argued before CLARKE, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and SMITH, JJ.

Nathan Burkan, of New York City, for appellant.
David Gerber, of New York City, for respondent.

LAUGHLIN, J. The plaintiff, claiming to own the literary rights as well as the performing rights in a dramatization of Alexander Dumas' novel, "The Count of Monte Cristo," by Charles Fechter, brought this suit in equity to enjoin the defendant from producing or exhibiting, or distributing for production and exhibition, on the stage or in any theater or place of amusement, any motion picture films containing in whole or in part any of the scenes, incidents, plot, or story of said novel as so dramatized, or any simulated or colorable imitation or adaptation thereof.

Dumas' novel was published in 1845. He wrote a dramatization thereof in French in 1848. There was a dramatization prior to 1870 in English, known as the "French-Lacy Dramatization." Charles Fechter, a Frenchman, wrote another English dramatization of the novel for Benjamin Webster, who was a celebrated actor and the manager of the Adelphi Theater, London, England, and it was publicly performed at that theater on or about the 19th of October, 1868; Webster playing the rôle of Noirtier, which was written expressly for him, and Fechter the rôle of Edmond Dantes, who becomes the Count of Monte Cristo. As a condition precedent to the issuance of a license to

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

present the play, under the English statute regulating theaters (6 & 7 Vict. c. 68, § 12), a printed copy of this dramatization by Fechter was filed with the Lord Chamberlain of Her Majesty's Household on the 17th day of October, 1868, and such a license was duly issued. The London newspapers, including the Daily Telegraph, gave extended accounts of the play as thus presented.

According to the testimony of the plaintiff, Fechter thereafter came to the United States and appeared in the presentation of the play in the same rôle in various theaters in this country from 1873 until his death in 1879, and "produced it from the manuscript in his possession." The plaintiff also testified that in the year 1883 he was employed by John Stetson, who owned the Globe Theater, in Boston, Mass., to appear in the title rôle in the presentation of "Monte Cristo" in New York City, and that in the month of June, 1885, he purchased from Stetson for the consideration of $2,000 all of the right, title, and interest of the latter in the Fechter version of the Count of Monte Cristo, which Stetson claimed to have purchased from Arthur Cheney, and received from Stetson a bill of sale thereof and the typewritten manuscript, the title page of which is as follows:

*Monte Cristo,*
Arranged and Adapted Expressly for
*Arthur Cheney, Esq.,*
Proprietor and Manager of the
GLOBE THEATER, BOSTON, MASS.,
by
CHARLES FECHTER, ESQUIRE,
Under the Stage Direction of
*Arthur Le Clercy.*
First Representation
at
GLOBE THEATER, BOSTON, MASS.
on
*Monday Evening, Sept. 12th, 1870,*
and
Now the Property of
MR. JOHN STETSON
of the
FIFTH AVENUE THEATER, NEW YORK
and the
GLOBE THEATER, BOSTON, MASS.,
Who Has the Sole and Exclusive Right of Production for the
UNITED STATES AND CANADA.

It appears, by a comparison of this manuscript with the printed play filed with the Lord Chamberlain in London as aforesaid, that the play as originally written by Fechter had been abridged by the elimination of many parts for the purpose of shortening the production, but otherwise they are the same. The recitals on the title page of the plaintiff's manuscript of the play constitute the only evidence of the authorship thereof. The plaintiff testified that Fechter appeared in the play at the Globe Theater in Boston, of which Arthur Cheney was one of the proprietors, and that Cheney died prior to 1883.

[1] The trial court found, in effect, that the defendant used the Fechter version in making a motion picture film for the production of Monte Cristo as a motion picture play. The defendant excepted

to such finding, and, although we are not expressly asked to reverse it, counsel for appellant contends that no infringement was shown. The defendant is a corporation organized under the laws of Maine, and is engaged in the business of renting and distributing films for motion pictures. It employed the Selig Polyscope Company, an Illinois Corporation, to make a motion picture film for the presentation of the motion picture play, and that company engaged actors and actresses, whose playing was photographed by it. Between the 14th day of October, 1912, and the 13th day of January, 1913, the defendant distributed among motion picture theaters 40 or more motion picture films, from each of which the play was publicly presented. The usual practice of the company in making a motion picture film of a play or novel was to prepare a scenario, which is used by the director who has charge of preparing and presenting the scenes of which motion pictures are taken. The motion picture photoplay prepared for defendant consisted of three reels, with 30 pictures in the first, 39 in the second, and 27 in the third.

No evidence was offered on the part of the defendant with respect to the source from which the scenario used in making the motion picture was taken, and no explanation with respect thereto was offered. The trial court by consent witnessed a presentation of the motion picture photoplay as presented by defendant, and was thereby aided in determining the question of fact; but without the evidence thus taken by viewing the picture it is quite clear from the record that the motion picture photoplay presented by the defendant was prepared to a large extent from the Fechter dramatization, for many scenes and incidents are depicted therein which are either not found in the novel or in any other dramatization thereof, or in the order as presented by the Fechter dramatization and by defendant's films. In the novel Noirtier is the father of Villefort, and is an unimportant character in the story, and this is followed in the other dramatizations; but Fechter changed the character of Noirtier, making him the half-brother of Villefort and one of the leading characters in his dramatization, and this change is substantially followed in defendant's films. In the novel and the other dramatization, Albert is the son of Mercedes and Fernand. Fechter changed this character, making him the son of Mercedes and Dantes, and makes use of this change in a dramatic way near the end of his dramatization, where he has Mercedes prevent a duel between Albert and Dantes, by informing the latter that Albert is his son, and this incident is found in defendant's films. The scene at the end of the Fechter dramatization, in which Dantes kills his enemy, Danglars, in a duel, is original with Fechter, and is reproduced in the last picture in defendant's films. In the novel and the other dramatizations, after Dantes has substituted himself for the dead body of the Abbé in the burial sack, and has been thrown into the sea from the Chateau D'If, he extricates himself from the sack and swims to and climbs upon a rock or an island and thanks God for his deliverance. In the Fechter dramatization, after Dantes gains the rock, he exclaims:

"Saved! Mine, the treasures of Monte Cristo! The world is mine!"

This is original with Fechter, although in the Dumas dramatization, after Dantes has visited the island of Monte Cristo and has found the buried treasure of Spada, of which the Abbé Faria had told him, he exclaims:

"Faria told the truth! The treasure of the Spadas is mine! The world is mine!"

One of the pictorial posters used by Stetson to advertise performances of the play, at the time the plaintiff appeared in it for him, showed Dantes standing upon a rock in the sea, with the Chateau D'If in the distance, with his arms outstretched and the knife with which he freed himself from the sack in his hand, and underneath was printed the words, "The World is Mine!" In the presentation of defendant's photoplay, just following a picture showing Dantes in the sea freeing himself from the sack with the knife, were flashed on the screen the words "The World is Mine," and then followed a picture showing him emerging from the water and appearing on a rock with outstretched arms. It thus appears that the trial court was warranted by the evidence in finding that the defendant used the Fechter dramatization.

[2] The next question to be considered is whether the Fechter dramatization was dedicated to the public, either by filing the printed copy with the Lord Chamberlain, or by the expiration of the statutory period of 42 years from the first public representation or performance in England. St. 5 & 6 Vict. c. 45, §§ 3 and 20. These statutory provisions gave protection to the *performing rights* in plays for the period provided for copyright in books, which was for the natural life of the author and for seven years after his death and until the expiration of 42 years from the first publication. Seven years after Fechter's death expired before the end of 42 years from the first public performance in 1868. The period during which the performing rights were protected expired in 1910. I am of opinion that there is no force in the argument that there was a dedication to the public by filing the printed copy of the play as stated, for that was a condition precedent, under the English statute regulating theaters, to the right to present a public performance of the play. St. 6 & 7 Vict. c. 68, §§ 12 and 13.

[3, 4] Upon no theory can it be held that the newspaper accounts of the presentation of the play constituted a dedication by the owner thereof to the public. If the play had been copyrighted in England, then the argument of the learned counsel for the appellant that it became dedicated to the public at the expiration of the copyright would be unanswerable, for the same rule is applicable to copyright of literary works as obtains with respect to patents and registered trademarks. Merriam et al. v. Shoes & Clothing Co. (C. C.) 47 Fed. 411; Merriam v. Syndicate Pub. Co., 207 Fed. 515, 125 C. C. A. 177, appeal dismissed 237 U. S. 618, 35 Sup. Ct. 708, 59 L. Ed. 1148; Atlas Mfg. Co. v. Street & Smith, 204 Fed. 398, 122 C. C. A. 568, 47 L. R. A. (N. S.) 1002, appeal dismissed 231 U. S. 348, 34 Sup. Ct. 73, 58 L. Ed. 262. But the publication of the play under the then

existing English Copyright Law, as under our own, except in the case of works of which copies are not reproduced for sale, was a condition precedent to obtaining a copyright (St. 5 & 6 Vict. c. 45; Copinger on Copyright [5th Ed.] pages 16 and 22, 531; Act Cong. March 4, 1909, c. 320, §§ 9 and 11 [35 U. S. Statutes at Large, pp. 1077, 1078, U. S. Comp. St. 1913, §§ 9530, 9532]); and if it had been copyrighted in England, unless copyrighted in the United States simultaneously, it would have become public property here the moment it was published for the purpose of obtaining the copyright in England (Ferris v. Frohman, 223 U. S. 424, 434, 32 Sup. Ct. 263, 56 L. Ed. 492; Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480; Drone on Copyright, p. 577).

[5] The Fechter dramatization, however, was not, so far as the evidence shows, copyrighted under the English law. All that was done that in any manner comes within the English Copyright Law was the presentation of the play at the Adelphi Theater, London; and under the English statute amending the Copyright Law (St. 5 & 6 Vict. c. 45, § 20) such public presentation was declared to be "deemed equivalent" in the construction of *that act,* which provided that:

The "sole liberty of representing or performing, or causing or permitting to be represented or performed, any dramatic piece * * * shall endure and be the property of the author thereof, and his assigns, for the term in this act provided for the duration of copyright in books," to the "first publication of any book."

The object of those statutory provisions and the earlier statute (St. 3 & 4 Wm. IV, c. 15) was to preserve the *performing* rights of the owner of a published play, which under the former English Copyright Law would have been lost by a public performance thereof; but they applied alike to published and to *unpublished* plays. Drone on Copyright, pp. 119, 285, 286, 574–576; Ferris v. Frohman, supra, 223 U. S. 432, 32 Sup. Ct. 263, 56 L. Ed. 492.

The learned counsel for the appellant ingeniously argues that any one was at liberty to produce the play in England after the expiration of the statutory period during which the right *to produce* it was protected there, and that therefore it should be deemed that the play thereupon became dedicated to the public the world over. That would be giving effect here to the English law; and since, in so far as appears, there has been no publication of the play, and a public performance of it under our law is not a dedication (Palmer v. De Witt, supra; Ferris v. Frohman, supra), it cannot be held that any rights existing here during the period during which the statute was running in England have been lost by the expiration of the period of statutory protection there. It was held in Ferris v. Frohman, supra, on like facts, excepting that the statutory period of protection of the performing rights of the play under the English statute had not expired, that the common-law rights in the unpublished play here were in no manner affected by the English statute. Therefore it is quite clear that whatever rights existed have not been lost by filing the printed copy of the play with the Lord Chamberlain, or by the presentation of the play on the stage in England.

[6] The next question to be considered is whether the plaintiff established a sufficient title or interest to enable him to maintain the action. The only title he claims is that derived from Stetson, his assignor, and from his possession of the manuscript in the original form without publication since, and the performance of the play continuously since, involving upwards of 5,000 performances of it, under a claim of ownership both of the play and of the performing right therein, and his maintenance of his right. by bringing actions against all who have threatened to violate them, and by preventing the presentation of the play by others without their acknowledging his rights and paying royalty to him for the privilege. The only evidence of Stetson's ownership of the play and of the performing right therein, aside from the recitals on the title page of the manuscript, is evidence to the effect that prior to selling the play to the plaintiff he presented it at various theaters for some years, and that he had possession of the manuscript, and verbal declarations by him to the effect that he had purchased the Globe Theater and the play from Cheney, and an allegation in a complaint verified by him on the 11th of September, 1884, in a suit against one Studley in the Supreme Court in Kings county to enjoin the presentation of the play, to the effect that he was the sole and exclusive owner of the play and had purchased it from Cheney on the 31st day of August, 1877.

The trial court found that Fechter gave public performances of the play from the year 1873 until his death in 1879, and that during all of that time he had in his possession a copy of the manuscript which Stetson assigned to the plaintiff. It does not appear whether Fechter was performing the play in his own right down to the time of his death; but there is no evidence that he was at any time employed by Stetson to perform it, and from the finding it appears that he continued to perform the play some two years after Stetson claimed to have acquired the play and the performing right therein from Cheney. The record on an appeal from a temporary injunction order herein contained a copy of an affidavit made by Stetson in the Studley suit, in which he stated, in effect, that he was a witness to a verbal agreement between Fechter and Cheney in the year 1871, by which it was agreed that Fechter had written the play for Cheney, and Fechter, for the consideration of $500 then and there paid to him by Cheney, verbally assigned all his right, title, and interest in and to the play to Cheney, upon the understanding that Fechter was to have the privilege during his life of personally presenting the play (155 App. Div. 887, 140 N. Y. Supp. 1134); but that affidavit was not offered in evidence on the trial, and as Cheney, Fechter, and Stetson all died before the trial, the fact could not be proved. The only importance of this is to show how difficult it may be to present competent evidence of a good title.

[7] If Fechter dramatized the novel, and afterwards revised the dramatization by abridging it for production in this country, as indicated by the testimony of the plaintiff, the literary property in such dramatization and revision, including the performing right, was in him, unless by agreement he parted with it, and the mere fact that he was then engaged at the Globe Theater as an actor conferred no right,

title, or interest in the dramatization or revision upon the managers or proprietors of the theater, and they could become the owners of the play, or acquire an interest therein, only by agreement between him and them. Boucicault v. Fox, 5 Blatchf. 87, Fed. Cas. No. 1,691; Shepherd v. Conquest, 17 Common Bench Reports, 427. It appears by the testimony of the plaintiff that the widow of Fechter brought suit against Stetson to enjoin him from producing the play, but that "the case was withdrawn on account of her death," which occurred shortly before he purchased the play from Stetson.

The trial court found that there was no evidence that Cheney owned the *exclusive* right to publicly perform the play. This may be accounted for by the fact that the plaintiff testified that Cheney was *one* of the proprietors of the Globe Theater, or by the fact that Fechter continued to perform the play from a copy of the manuscript which he had until his death. The trial court also found in effect that the statement on the title page of the manuscript, "Now the property of John Stetson," was not made until after the 31st day of August, 1877, which is the date on which Stetson, in the complaint against Studley, claimed to have acquired the play from Cheney.

[8, 9] It is quite clear, I think, that title to *a chattel* may be acquired by adverse possession and claim of ownership, and on the evidence title to *the manuscript* by adverse possession and claim of ownership was sufficiently shown (Lightfoot v. Davis, 198 N. Y. 261, 91 N. E. 582, 29 L. R. A. [N. S.] 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747); but present title to the manuscript, while some evidence of the ownership of the play, if standing alone, might be insufficient to sustain the action, for the owner might have parted with possession of the manuscript without parting with his rights as an author (Stephens v. Cady, 14 How. 528, 14 L. Ed. 528; People v. Roberts, 159 N. Y. 70, 53 N. E. 685, 45 L. R. A. 126; Crowe v. Aiken, 2 Biss. 208, Fed. Cas. No. 3,441; Pub. Co. v. Smythe [C. C.] 27 Fed. 914; Curtis on Copyright, page 87; Drone on Copyright, pages 98 and 99, 104, 105, 618 and 622), and they are the rights invaded and threatened to be invaded by the defendant.

No decision is cited, and we have found none, which holds that *such* rights may be acquired by adverse possession and claim of ownership. If the controversy were between the plaintiff and Fechter, or his representatives, and it appeared that Fechter made the dramatization and revision *in his own right,* it may well be that the evidence in the record now before the court would be insufficient to show that the title of the author had been acquired by the plaintiff; but the question here is whether the plaintiff has shown sufficient title as against a stranger to any right, title, or interest in the play, and in such case I think less evidence should suffice to establish a prima facie case.

[10] The recitals on the title page of the manuscript of the play which Stetson assigned to the plaintiff, and Stetson's verbal declarations, and his allegation in the complaint in the action brought against Studley, are not competent evidence of the *source* of his title, either to the literary or to the performing right in the play; but they are, I

think, competent evidence to characterize the title which he claimed by virtue of the manuscript of which he had possession, and constitute some evidence of title, not only to the manuscript, but to the play, and to the performing right. 3 Wigmore on Evidence, § 1779. See, also, 2 Wigmore on Evidence, §§ 1573, 1574, 1576; Jones on Evidence, par. 2, § 311, p. 702. The plaintiff evidently has presented the best evidence obtainable with respect to the ownership of this play, and it is in no manner impeached or controverted, and I am of opinion that it sufficiently shows title to enable him to maintain the action.

[11] The evidence showed, and the trial court found, that the plaintiff and his assignor, Stetson, for the purpose of advertising performances of the play, took flashlight photographs of many of the important scenes and incidents of the play as represented on the stage, and reproduced therefrom pictorial posters and prints, and widely circulated and displayed them in show windows and on billboards and other public places in various parts of the United States. Counsel for appellant contends that this constituted a publication of the play, or of its important features, and that any one was thereafter at liberty to present the play with such features by motion pictures. The public presentation of a play is not a dedication thereof. Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480. The public posting of posters and prints was merely incidental to the presentation of the play. The posters and prints did not tell the story of the play in connected form, or constitute a representation of the drama. See Kalem Co. v. Harper Bros., 222 U. S. 55–62, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285. Such a publication in no sense constitutes a dedication to the public of the play or the performing right.

[12] Counsel for appellant finally contends that in any event the complaint should have been dismissed for want of right in the plaintiff to equitable relief on November 18, 1912, when the action was commenced. The basis of his contention in this regard is the copyrighting by the Famous Players' Film Company, with the consent of the plaintiff, of a motion picture photoplay of the plaintiff's play, and the facts preceding it.

The plaintiff testified, and the trial court found, that on or before the 1st day of November, 1912, he made a contract with said Famous Players' Company for the making of a motion picture film "adapted to reproduce in motion pictures" the said drama "Monte Cristo"; that, for the purpose of making the pictures, plaintiff engaged a company of actors and actresses, who in costume and with the aid of, scenery gave performances of the play before a high-speed camera, and that positive films have been prepared by said company with the consent of the plaintiff; that the plaintiff caused to be given through said company exhibitions of Monte Cristo in motion picture theaters with the aid of said positive films, and that said exhibitions were advertised and announced under the title "Monte Cristo"; that for the purpose of enabling said company to make said films and to give performances, plaintiff delivered the play to its stage director and assisted in making the films; that the films "adapted to reproduce in motion pictures said play" were released for distribution and circulation among

exhibitors and motion picture theaters on the 1st day of November, 1912; that with the consent of the plaintiff said company secured copyright in said films "adapted to reproduce in motion pictures said play" on the 10th day of December, 1912; that to secure copyright in the motion picture photoplay "a description of said motion picture photoplay was filed in the office of the Register of Copyrights on the 16th day of December, 1912." The plaintiff testified in effect that his contract with the Famous Players' Company was in writing, but it was not offered in evidence; and the evidence with respect thereto goes only to the extent already stated.

By the steps taken by the plaintiff and by the Famous Players' Company under that contract, which culminated in copyrighting the motion picture films, it is quite clear. I think that the plaintiff parted with any common-law motion picture rights he had in the play, to the extent, at least, represented by the motion pictures thus taken and copyrighted; but whether all common-law motion picture rights with respect to scenes and incidents in the play not represented in the copyrighted motion pictures films, and not preserved by the substituted statutory right, have been abandoned or lost, is a question not free from difficulty and on which we find no precedent.

[13] It is well settled that an author or an owner of a book or play, by publishing it, which is a condition precedent to obtaining a copyright, waives and abandons his common-law rights therein, and must thenceforth depend upon the statutory rights conferred by the acts of Congress, which give exclusive rights and provide for injunctive relief and damages, but those rights must be enforced in the federal courts. Caliga v. Inter-Ocean Newspaper Co., 157 Fed. 186, 84 C. C. A. 634, affirmed 215 U. S. 182, 30 Sup. Ct. 38, 54 L. Ed. 150; Jewelers' Mercantile Agency v. Jewelers' Pub. Co., 155 N. Y. 241, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666; Photo-Drama Motion Picture Co., Inc., v. Social Uplift Film Corporation, 220 Fed. 448, 137 C. C. A. 42; Act Cong. March 4, 1909, c. 320 (35 U. S. Statutes at Large, p. 1075), as amended by Act Cong. Aug. 24, 1912, c. 356 (37 U. S. Statutes at Large, p. 488) §§ 1, 23, 25, 26, 27, 34, 35, 36, 37, 38; Rev. St. U. S. 1878, § 711; Judicial Code (Act March 3, 1911, c. 231) § 256, 36 Stat. 1100 (U. S. Comp. St. 1913, § 1233). A photoplay taken from a book constitutes a dramatization of the author's work, which may be copyrighted. Kalem v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285; Photo-Drama Motion Picture Co., Inc., v. Social Uplift Film Corporation, supra.

[14] When a book or drama is dedicated to the public, any one may prepare and copyright a motion picture photoplay founded thereon; but such copyright will not give the owner thereof an *exclusive* right to the motion picture rights in the book or drama, for it has been held that, although any one is at liberty to translate or to dramatize a book that has become public property, no translator or dramatizer thereof can obtain an exclusive right to more than his own literary work in translating or dramatizing, and all others are free to do the same, provided they do not appropriate anything original in his

work. Drone on Copyright, pp. 158, 159, 232, 433, 449, 458 and cases cited; Shook v. Rankin, 6 Biss. 477, 482, Fed. Cas. No. 12,804; Crowe v. Aiken, 2 Biss. 208, Fed. Cas. No. 3,441; Boucicault v. Wood, 2 Biss. 34, Fed. Cas. No. 1,693.

[15] Where one owning an unpublished play and all rights therein in a foreign language and the work of a foreign author, which could not for that reason be copyrighted here, copyrights a translation there-'of, or, having the dramatization rights, copyrights a drama, it has been held that he forfeits all rights save those preserved by the Copyright Law, and that others are free to translate or to dramatize the original work, provided they do not infringe upon the original work of translation in the copyrighted translation. Shook v. Rankin, supra. See Drone on Copyright, pp. 582–585. By publishing the translation or dramatization, which was required as a condition precedent to obtaining the copyright, the owner of the play or of the dramatization rights is deemed to have dedicated the entire play or dramatic rights to the public. In such case it may be presumed, I think, that the translation or dramatization was a substantial reproduction of the original work. Copyrighting a motion picture photoplay of an author's work, however, does not either necessarily or presumptively involve a dedication to the public of the motion picture rights with respect to *all* the scenes and incidents of the play; and in the case at bar, although the court has found that the copyrighted motion picture photoplay is adapted to present the plaintiff's play by motion pictures, yet it fairly appears that many scenes and incidents in the plaintiff's play, which have never otherwise been dedicated to the public, are not represented in the motion picture films which have been copyrighted.

The copyright of the motion picture photoplay by the Famous Players' Company does not under the law constitute a copyright of the plaintiff's play. The law does not require that the sources from which the pictures are taken be given either in the application for copyright, registration, or otherwise, and neither in the application for copyright registration nor in the description of the motion picture photoplay filed in the office of the Register of Copyrights, in the case at bar, is there any reference to the source from which the pictures were obtained. In this respect I think the copyright of a motion picture photoplay differs from the copyright of a book or drama, or of a translation. So far as shown by the evidence, the only right, title, or interest the plaintiff has parted with is such as was essential to obtaining the copyright, and all that he has authorized to be published, and was required to publish as a condition precedent to obtaining the copyright, were the titles and particular scenes and incidents photographed, together with a description thereof (section 11 of the Copyright Act); and I am of opinion that the dedication to the public should be deemed limited accordingly, and that no one is at liberty, without the consent of the plaintiff, to appropriate his unpublished play, excepting in so far as he has thus dedicated rights therein to the public. It may be that the scenes and incidents in the plaintiff's play, not published by the copyrighting, have no substan-

tial value for motion picture photoplay purposes; but it is manifest that his right to present the play as he has done heretofore might be prejudicially affected if others were at liberty to present a motion picture photoplay founded in whole or in part on the unpublished scenes or incidents in his play.

[16] The plaintiff, or the owner of the copyright, must seek redress for any infringement thereof in the federal courts; but the state courts have jurisdiction to enforce his reserved common-law rights. These views would require a modification of the decree by excluding from the scope of the injunction scenes and incidents of the plaintiff's play which have been copyrighted; but, if an injunction is to be issued at all, evidently a modification is not deemed material, and is not requested. Since, however, the plaintiff has not seen fit to defer action in the state court to enforce his remaining common-law rights until it has been decided in the federal courts to what extent the owner of the copyright is entitled to recover damages for the infringement of the copyright, and since it is not competent for a state court to decide that question, I am of opinion that the recovery of damages herein must be limited to the time the copyright was obtained.

It follows, therefore, that the judgment should be modified by limiting the recovery of damages to the 10th day of December, 1912, and, as thus modified, affirmed, without costs. Settle order on notice. All concur.