John SZEKELY, also known profession-
ally as John Pen, Plaintiff,

v.

EAGLE LION FILMS, Inc., General Film
Distributors, Ltd., J. Arthur Rank, Rod
Geiger and Nat Bronsten, Defendants.

United States District Court
S. D. New York.

May 8, 1956.

**844**

Phillips, Nizer, Benjamin & Krim, New York City (Walter S. Beck, Seymour Shainswit, New York City, of counsel), for defendant Eagle Lion Films, Inc.

DAWSON, District Judge.

This action alleges infringement of plaintiff's common law right of literary property in an original unpublished screen play and seeks an injunction and damages. The action was tried by the Court without a jury.

Although five defendants are named in the complaint, the defendant Eagle Lion Films, Inc. (hereinafter called "Eagle Lion") is the only defendant remaining in the case. Three of the other defendants were never served with process, and the plaintiff consented to dismissal of the case against the defendant Rod Geiger when no attorney appeared for him at the trial of the action.

The Court has jurisdiction of the action by reason of diversity of citizenship.

The Facts

The Court finds the following facts:

1. The plaintiff has been a writer by profession for thirty-five years using the name, for his literary works, of "John Pen". His writings include a half dozen books and stage plays and over forty motion picture stories. For one of the motion picture stories he received an Academy Award, otherwise known as an "Oscar".

2. The defendant Eagle Lion was engaged in the distribution of motion pictures for some years until June, 1950, at which time this defendant transferred its distribution business to Eagle Lion Classics, Inc.

3. Among the pictures that Eagle Lion distributed was one entitled "Give Us This Day" which was sometimes entitled "Salt To The Devil", which plaintiff contends was produced from his original screenplay without his consent.

4. In or about 1937, Pietro D. Donato wrote a short story entitled "Christ in Concrete" which was published in the

Fitelson & Mayers, New York City (Benjamin Aslan, Harold J. Sherman, New York City, Howard Gotbetter, Brooklyn, N. Y., of counsel), for plaintiff.

March, 1937 issue of "Esquire" magazine; and thereafter, this story was expanded into a novel also entitled "Christ in Concrete" which was published by Bobbs-Merrill and copyrighted in 1937 and 1939.

5. Thereafter, Rod E. Geiger Productions, Inc. (hereinafter called "Geiger Productions") acquired from Di Donato an exclusive license to produce a motion picture based upon the novel.

6. On November 13, 1947, a contract was entered into between the plaintiff and Geiger Productions whereby plaintiff agreed to render services as a writer "in connection with the writing and preparation of a final screenplay based upon the literary property entitled Christ in Concrete, a novel written by Pietro Di Donato, to be produced as a motion picture film by Rod E. Geiger Productions, Inc." Geiger Productions agreed to pay the plaintiff for his services $35,000 in four installments, the last of which was to be due within three days after presentation of the final draft of the screenplay. In addition, plaintiff was to receive 5% of the producer's share of the net profits derived from the exploitation of the motion picture. Paragraph 6 of the contract provided:

"6. Title to the manuscript and the ideas therein contained, including all rights of any kind and character whatsoever in and to the said manuscript, shall be vested solely in John Pen unless and until he shall be paid the sum of $35,000 as herein provided."

Paragraph 7 provided that "Except as provided in paragraph 6", Geiger Productions would own "all rights of every kind and character whatsoever in and to all of the results and proceeds of your services hereunder." The same paragraph also prohibited the plaintiff from transferring or attempting to transfer any interest or right in the material created by himself.

7. The plaintiff received $10,000 with the contract document in satisfaction of the first two installments. He presented a final draft of the screenplay early in 1948, but received no further payments from Geiger Productions.

8. In March of 1948, Rod E. Geiger, President of Geiger Productions, wrote to the plaintiff describing financial difficulties which required cutting down on the number and magnitude of the sets. He wrote that he had "put on a local writer to make necessary script changes". Ben Barzman was named as the local writer. The letter also contained a request that the plaintiff consent to modification of the terms of payment. There is no evidence that this request was ever acted upon.

9. Sometime early in 1949, the filming of the motion picture was commenced in England. Shortly before the filming the plaintiff learned of this. His attorneys sent a telegram to Edward Mosk, attorney for Rod E. Geiger, on January 25, 1949, giving notice that the filming would violate the plaintiff's rights. In return, on the following day, Mosk wrote that he had forwarded the telegram to Geiger in England. He stated that:

"I am informed that no part of the script which was prepared by Mr. Pen is being used in the production of the motion picture as presently planned."

10. About a week later, the plaintiff's attorneys heard directly from Geiger in England who wrote that

"at this time * * * the present production plans in England has [sic] an entirely new script and containing no part of Mr. Pen's work."

Geiger's letter also reported the failure of Geiger Productions to finance the filming and production and stated that the English production was being undertaken by another company that he was personally interested in. The letter contained the statement that

"the financial situation here in England is somewhat stringent and by ruling of the Bank of England the Producing Company is not able to pay dollars for any participant in this production."

It then continued:

"This does not mean that I do not recognize the monies due Mr. Pen—I most certainly do—and I am willing to assign from my share of the American proceeds of the film the monies due Mr. Pen. If I were in a position to settle the matter myself personally I most certainly would. However I might add that in the event of any trouble along these lines that might jeopardise the production, which would mean that I would be in no position to pay Mr. Pen in the near future, if ever."

11. On February 28, 1949, Mosk, attorney for Geiger, wrote the plaintiff's attorney in answer to a letter that is not in evidence. Mosk advised that the plaintiff's best protection lay in the completion of the filming.

12. The plaintiff never took any legal proceedings to enjoin the production of the film in England. He testified that the belief that his best chance of getting paid was to allow completion of the filming and distribution had played a very great part in his decision to refrain from legal action. How much Geiger's assurance that plaintiff's work was not being used affected his decision was not indicated.

13. The filming was completed in England in the same year, 1949. According to the Catalog of Copyright Entries published by the United States Government, the film is described as a Plantagenet film produced by Geiger and Bronsten and copyrighted by Plantagenet.

14. Distribution rights on the film were granted to General Film Distributors, Ltd., of England. This company granted to Eagle Lion the right to distribute the picture in the Western Hemisphere and covenanted with Eagle Lion that any film delivered would not infringe upon common law rights or copyright.

15. In November, 1949, the plaintiff learned by reading "Variety", the trade paper for the theatrical business, that Eagle Lion was contemplating distributing a motion picture in this Country based on the novel "Christ in Concrete". At plaintiff's instance, his lawyer wrote a letter to Eagle Lion dated November 29, 1949 advising them that he represented the plaintiff "who was engaged to do the scenario and to whom there is still due and owing the sum of $25,-000.00." This letter then continued:

"Unless arrangements are made to pay Mr. Pen, we will be obliged to take such steps for his protection as we may deem advisable, including, if need be, injunctive proceedings against the showing of the picture, with his work included."

While the president of Eagle Lion testified that he had no recollection of the receipt of the letter and could not find it in his files, sufficient competent evidence was given to prove the mailing of the letter. The same officer testified that he had no recollection of a subsequent letter of February 7, 1950 and could not find it in his files, but admitted that it was received by the defendant company. The testimony of this officer that he had not been aware of the letter is not contradictory of its receipt which must, accordingly, be presumed as a fact. News Syndicate Co. v. Gatti Paper Stock Corp., 1931, 256 N.Y. 211, 214, 176 N.E. 169; 1 Wigmore, Evidence (3rd Ed. 1940) § 95.

16. Eagle Lion released the film for distribution. It was first exhibited at the Rialto Theatre in New York City on or about December 20, 1949. Certain of the newspaper reviews which followed this initial showing described it as:

"An Eagle Lion Film Release. Produced by Rod E. Geiger and N. A. Bronsten. Directed by Edward Dmytryk. Screenplay by Ben Barzman. Adapted by John Penn. From the novel by Pietro Di Donato."

On the original film so exhibited, there was credit given to the plaintiff for the "adaptation".

17. On February 7, 1950, the attorneys for the plaintiff wrote a second letter to Eagle Lion, calling attention to the contract between the plaintiff and Geiger Productions, and stating, in part:

"Pursuant to said contract there is still due our client the sum of $25,000. and no assignment, license or other disposition of any rights whatsoever has been made or executed by Mr. Szekely in regard to said screenplay. Accordingly, it appears that you have and are continuing to violate and infringe upon our client's valuable property rights in and to said screenplay and have caused and will continue to cause him irreparable damage."

The letter stated that the attorneys had been authorized to institute action, but would like to give Eagle Lion an opportunity to conclude an amicable adjustment of the matter. Eagle Lion's legal department answered the letter by stating that Eagle Lion had no contract with Geiger Productions and that if the latter owed plaintiff $25,000 "it would seem" that the plaintiff should press his claim on the company and not on Eagle Lion. The present action was begun on April 18, 1950.

18. Eagle Lion continued to distribute the film either under the name of "Give Us This Day" or "Salt To The Devil". The exhibits put in evidence by the defendant showed that it received from the distribution of this film to January 1, 1955 net gross receipts of $46,719.84 from which it remitted to the producer $29,758.04, leaving a balance of its gross receipts, less producer's share, of $16,961.80. Defendant contends that it had certain overhead expenses of distribution of the picture, and that the distribution of the picture by it, after paying those expenses and the producer's share, actually ended in a loss to it.

19. A comparison of the original novel written by Di Donato with the script of the plaintiff and the final shooting script as used in the filming of the picture establishes as a fact that plaintiff's screenplay and not the Di Donato novel was the primary source for the creation of the shooting script actually used. This comparison confirms the statement made at the time of the release of the film, and which apparently was set forth in the "credits" section of the film, that the screenplay was an adaptation by the plaintiff of the Di Donato novel, even though the final screenplay was written by Barzman. The casts of characters of the three works are largely the same. The hero and heroine of the screenplay may be said to be the Italian-Americans Geremio and Annunziata, who are man and wife and have several children, including Paul, the eldest son. Geremio is a construction worker. The novel commences a few days before Geremio's death resulting from the collapse of part of a building upon which he is working. The novel thus picks up the story of Geremio and Annunziata long after they have entered matrimony and have had several children. They are at the time living in their own house. The main characters in the novel are the eldest son Paul and the widowed Annunziata. Plaintiff's script, however, treats the story in an entirely different manner. It shows the early life of Geremio, a young construction laborer, who longs for a wife and family. He falls in love with a picture of Annunziata shown to him by Luigi, a fellow laborer, (and not Annunziata's brother as in the novel). The script shows the arrival of Annunziata in America to marry Geremio. It shows the wedding festivities. It shows the struggles of Geremio and Annunziata to attain the goal of having their own house. It shows their life after the wedding in a rapid depiction of years as they go forth having more babies and putting more savings toward the house. Each baby, and finally the depression, brings a setback in the road to acquiring the house. Thus the screenplay prepared by the plaintiff depicts not so much the impact of Geremio's death upon his son and wife as it depicts the early life of Geremio and Annunziata leading up

to the death of Geremio. This is the essential theme of the script as finally used in the motion picture. While a number of scenes of the plaintiff's script have been omitted by Barzman and Barzman supplied some new scenes and variations, the similarities show that a substantial use was made of plaintiff's work. In some instances dialogue, descriptive passages and directions have been copied verbatim or almost so. There can be no doubt that Barzman had access to the script prepared by the plaintiff, utilized it to a substantial extent, and that the final shooting script was based, to a substantial extent, upon the literary work of the plaintiff.

### Discussion

■ There is no doubt that the plaintiff had a common law literary property in the motion picture script produced by him. DeAcosta v. Brown, 2 Cir., 1944, 146 F.2d 408, certiorari denied, Hearst Magazines v. DeAcosta, 1945, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983. Under the contract between plaintiff and Geiger Productions, plaintiff retained his literary property in his manuscript until such time as he should have received $35,000. He never received the $35,000.

■■ There is also no doubt that the film involved in this action was based, in substantial part, upon the script prepared by the plaintiff. In fact, the film itself indicated that it was based upon an adaptation by the plaintiff of the original novel. Plaintiff had never given his consent to the utilization of his literary product for the production of the film, in the absence of receipt of payment of $35,000 from Geiger Productions and, therefore, the use of his literary ideas in the production of the film constituted plagiarism and a deprivation of his literary property for which plaintiff is entitled to the issuance of an injunction and an award of damages. O'Neill v. General Film Co., 1st Dept. 1916, 171 App.Div. 854, 157 N.Y.S. 1028; DeAcosta v. Brown, supra. The Copyright Act provides that dramatizations of copyrighted works when produced with the consent of the copyright holder are to be regarded as new works entitled to statutory copyright protection. 17 U.S.C.A. § 7.

■ Defendant contends that plaintiff is barred by estoppel or laches from maintaining this action because of the fact that plaintiff failed to institute proceedings to enjoin the filming of the picture in England and because of the fact that plaintiff has never moved for a preliminary injunction in this action. Defendant urges that these facts show that the defendant was entrapped by the plaintiff into accepting the picture for distribution.

Plaintiff's failure to seek to enjoin the filming operation in England is not such as can be called unreasonable, in view of the letters received by him from the attorney for Geiger. The first of these letters stated that no part of his script was being used in the production, which would certainly lull him into a belief that he had no cause of action. The other letter gave him hope that if the film was completed, payment would be made to him, but that no payment could then be made to him because of the ban on the export of dollars. These statements made it reasonable for plaintiff to withhold action until the film was produced in the hope that at that time, a payment would be made to him.

Furthermore, the evidence showed that as soon as the film was produced and notice thereof appeared in the press in the United States, the plaintiff then advised the defendant of his claim by a letter. Whether defendant proceeded with the distribution of the film without giving consideration to his claim or whether it proceeded in reliance on the warranty which it had from the English distributor that the film did not infringe common law copyright and in the belief that it was thereby indemnified for any damages which it might incur, is a matter which might be left for speculation. In any event, plaintiff did not sleep upon his rights. He asserted his claim. He instituted this action.

■ It was not incumbent upon the plaintiff to apply for a preliminary injunction, and failure to apply for a preliminary injunction cannot be deemed either laches or grounds to assert an estoppel. A plaintiff is not required to apply for all the relief which a Court might be entitled to give him; and it would certainly be fantastic to conclude that because a plaintiff has failed to ask for one relief which might be available to him, he is thereby barred from asserting his right to any relief.

■ A sharp conflict was presented on the issue of damages. Ordinarily the law allows the victim of an infringement upon his literary rights to recover the profits made by the infringer or the damages suffered by himself. Profits would customarily be determined upon an accounting. In the present case, plaintiff's counsel stated at the end of the trial that they would rest solely on the basis of an action "for damages and punitive damages" and would not ask for any accounting, which must be taken as an election by the plaintiff to waive any claim for damages based upon profits of the defendant, and an election to rely solely on a claim for damages. The proof of net profits of the defendant from the distribution of the film was lacking and defendant contends, by reason of its overhead expenses, that it actually suffered a loss in connection with the distribution of the film.

The mere fact that defendant may not have made profits from the utilization of the literary production of the plaintiff is not conclusive on the issue of damages. The right to damages in such a situation is an alternative right to the right to recover the profits of the infringer.

We have in this case a utilization by the defendant of literary property which belonged to the plaintiff. Plaintiff, in his agreement with Geiger Productions, had retained full title to the manuscript until receipt by him of the full payment of $35,000. He was, therefore, in effect, retaining legal title to the manuscript as security for payment to him of the balance due to him.

Obviously, the value of the manuscript has been destroyed, since the motion picture has been produced and distributed, and there would be no opportunity for the sale of the manuscript now to anybody else.

■ The law is clear that where a person is entitled to a judgment for the destruction of a legally protected interest in property, damages include "the exchange value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, or a different value where that is necessary to give just compensation." Restatement of the Law, Torts, § 927.

The word "value" when used in the Restatement may mean either market value or "value to the owner". Thus the Restatement states:

"A person tortiously deprived of property is entitled to damages based upon its special value to him if that is greater than its market value." Ibid, § 927(c)

■ Defendant contends that plaintiff can establish no damages. It argues that the manuscript had no market value, since, in the very nature of things, it could not be sold or offered for sale to anybody other than Geiger Productions, which alone had the license from the author of the novel to produce the screenplay. This does not mean, however, that the property was valueless. Its value, at least to Geiger Productions, has been established by the contract. Even if there were no other market, this does not mean that damages could not be recovered, for plaintiff, in that situation, is entitled to damages "based upon its special value to him". This is peculiarly true in the case of a manuscript. See Restatement of the Law, Torts, § 911, Comment e. The special value to the plaintiff was the value of the security interest which he had in the manuscript and which was security for the payment to him of $25,000. That, at least, was the value to the plaintiff of the property

which was tortiously appropriated by the defendant.

Plaintiff has sought to argue that the damages were not limited to $25,000, but might equal $50,000. This argument, based upon what some other company might have paid for such a manuscript, is not of much value since the only market available was Geiger Productions. It is true that the contract with Geiger Productions provided that in addition to the fixed sum, he would also receive 5% of the net profits of the producer, but plaintiff has offered no proof of any profits of the producer from which this additional value might be determined. On the proof offered by the plaintiff, it is impossible to fix the damages of the plaintiff at a sum greater than that which he would have received from Geiger Productions, i. e., $25,000.

Defendant also contends that it made no money on the distribution of the film, and that, therefore, no damages can be collected from it. The evidence showed that defendant collected as net gross receipts from the distribution of the film $46,719.84. Thus it received in excess of $25,000, resulting in part from the tortious utilization of the manuscript of the plaintiff.

■ Defendant contends that not all of its gross receipts represented profits to it, since $29,738.04 was collected for the account of the producer, and since not all of the gross receipts were derived from the manuscript alone. This, however, is not an action which involves an accounting for profits. Both parties have treated it as an action which seeks damages alone. However, if the defendant contends that its gross receipts did not represent the true amount that it received from the picture, the burden was upon it to establish what amounts properly could not be considered as receipts by it and to disentangle the contributions of the several factors.

"* * *, it is equally true that an infringer carries the burden of disentangling the contributions of the several factors which he has confused. The law requires him to resolve any doubts arising from his wrong; he is like any other constructive trustee. Callaghan v. Myers, 128 U.S. 617, 666, 9 S.Ct. 177, 32 L.Ed. 547." Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1939, 106 F.2d 45, 48, affirmed 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825.

"Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him." Ibid, 309 U.S. 390, 406, 60 S.Ct. 681, 687.

In the present case, the defendant made no effort to establish what part of the gross receipts were attributable to factors other than the manuscript nor to establish any deductions from the gross receipts other than those deductions representing the "producer's share of gross receipts". The Controller of the defendant admitted that they had no accounting records which would segregate any expenses which were attributable to this particular film. Insofar as the "producer's share of gross receipts" is concerned, the defendant was receiving these receipts for the account of a corporation which it knew, or had reason to believe had also improperly appropriated the literary production of the plaintiff and which was, therefore, *in pari delicto* with it.

■ Plaintiff contends that he is entitled to punitive as well as compensatory damages. Press Pub. Co. v. Monroe, 2 Cir., 1896, 73 F. 196, 31 L.R.A. 353. That such damages may be given "to punish a wrongdoer and to deter others from the commission of a like wrong" is well established. The allowance of punitive damages and the amount are within the discretion of the trier of the facts, who has seen the witnesses and had all the facts before him. They are ordinarily only awarded against a person "to

punish him for his outrageous conduct". Restatement of the Law, Torts, § 908. The circumstances of this case are not such as would, in the opinion of the trier of the facts, warrant the imposition of punitive damages. Plaintiff recognized that his best chance of securing a payment on account of the amount due to him from Geiger Productions was to allow the production and distribution of the film. The plaintiff could, if he had chosen, have brought suit directly against Geiger Productions for payment of the amount due him under the contract, but he preferred not to do so. The award of damages in this case will give him all that he properly could have expected in the way of monetary damages. The Court, therefore, in the exercise of its discretion, declines to grant any award for punitive damages.

Plaintiff is, however, entitled to interest on $25,000 from December 20, 1949 to the date of the judgment to be entered herein. Restatement of the Law, Torts, § 913; Flamm v. Noble, 1947, 296 N.Y. 262, 268, 72 N.E.2d 886, 171 A.L.R. 812; Wilson v. City of Troy, 1892, 135 N.Y. 96, 104, 32 N.E. 44, 18 L.R.A. 449.

Conclusions of Law

The Court makes the following conclusions of law:

1. Plaintiff had exclusive right to utilization of his manuscript until he was paid a total sum of $35,000, of which he received only $10,000.

2. The distribution by defendant of a screenplay based upon plaintiff's script without license from the plaintiff constituted an invasion of the literary property rights of the plaintiff therein.

3. Plaintiff is entitled to damages in the sum of $25,000 as against the defendant Eagle Lion, together with interest thereon from December 20, 1949.

4. Plaintiff is entitled to an injunction enjoining defendant Eagle Lion and its agents, servants, and representatives from further marketing and distribution of the film.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Settle judgment and decree on five days' notice.