## MANNERS v. FAMOUS PLAYERS–LASKY CORPORATION.

(District Court, S. D. New York. December 11, 1919.)

1. CERTIORARI ⬥47—PENDENCY NOT STAY OF SUIT BY DEFEATED PARTY INVOLVING CONTRACT IN SUIT.

Pendency of certiorari proceeding in the Supreme Court to review a decree construing a contract *held* not to act as a stay in suit, by party defeated below against a third person, based on his construction of the contract.

2. COPYRIGHTS ⬥48—LICENSE CONTRACT CONSTRUED; "ALTERATIONS, ELIMINATIONS, OR ADDITIONS."

A provision of a contract granting exclusive license to produce a play, which includes also motion picture rights, that no "alterations, eliminations, or additions" shall be made .without the author's consent, *held* to apply to motion picture productions, and while alterations made necessary by the different method of production may be made without the author's consent, such as constitute a substantial deviation from the locus of the play, or the order and sequence of the development of the plot, may not.

In Equity. Suit by J. Hartley Manners against the Famous Players-Lasky Corporation. Decree for complainant.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

David Gerber, of New York City, for plaintiff. .

Nathan Burkan and Elek J. Ludvigh, ·both of New York City, for defendant.

MAYER, District Judge. This is a suit to restrain the production and release of the motion picture "Peg o' My Heart" and the making of additions thereto and alterations thereof. On January 19, 1912, plaintiff entered into a·contract with one Morosco, which was modified in certain particulars by a supplemental agreement dated July 20, 1914.

A litigation arose between the parties as to whether Morosco had acquired the motion picture rights, and, in a suit brought by plaintiff against Morosco, the.court dismissed plaintiff's bill, holding that Manners had conveyed these rights to Morosco. The details of this controversy will be found in Manners v. Morosco (D. C.) 254 Fed. 737, affirmed 258 Fed. 557, —— C. C. A. ——. Thereafter the Supreme Court allowed a writ of certiorari (250 U. S. ——, 39 Sup. Ct. 494, 64 L. Ed. ——), and the cause is now on the calendar of the Supreme Court awaiting a hearing, a motion to advance having been opposed by Morosco and having been denied by the Supreme Court.

Under paragraph "Eleventh" of the supplemental agreement, su- ·pra, it was provided:

"Eleventh.—Said Morosco is hereby expressly authorized to lease, sublet, assign, transfer, or sell, to any person or persons, firm, or corporation what-soever, any of his rights acquired under said original agreement or this supplemental agreement; it being expressly understood and agreed that no such leasing, subletting, assignment, transfer, or sale shall in any way release or discharge said Morosco from his personal liability to pay to said J. Hart-ley Manners the royalties in amounts, manner, and at the time, as specified in said original agreement and in this supplemental agreement."

On December 14, 1918 (a day after the decree dismissing the bill against Manners was filed), Morosco granted to this defendant—

"the exclusive right to reproduce" Peg o' My Heart "in the form of motion pictures or of a photoplay, and to publicly represent and cause to be repre-sented such reproduction in the United States and Canada."

In·view of Manners v. Morosco, supra, defendant, so far as appears from this record, is entitled to reproduce the play in motion pictures.

[1] The pendency of the certiorari proceedings between Manners and Morosco does not in any manner act as a stay in this suit between Manners and this defendant. The suggestion that the court, as matter of respect and courtesy, should wait until the Supreme Court shall have decided Manners v. Morosco, is not pertinent.

The production of a motion picture by these defendants will not render moot the question pending in the Supreme Court; for if the Supreme Court should reverse, Manners will have his appropriate remedies against Morosco, and could make this defendant (if the picture were produced)· respond to an appropriate accounting.

[2] ·There is thus left for determination the question arising out of paragraph "Seventh" of the agreement between Manners and Morosco, which reads as follows:

"No alterations, eliminations, or additions to be made in the play without the approval of the author."

This paragraph is not only a part of the original agreement, but, under the terms of the supplemental agreement, with other paragraphs, it was "in all respects ratified, confirmed, and approved." It cannot be held, therefore, that this paragraph Seventh refers only to the spoken play, but, on the contrary, it applies as well to a motion picture reproduction of the spoken play.

At the outset it is necessary to determine the proper construction of this paragraph. It is obvious that a spoken play cannot be literally reproduced on the screen. The screen must convey by pantomimic action and legends, or concise statements, whether by way of narrative or dialogue, the subject-matter and action of the play. Therefore an alteration, elimination, or addition, which is faithfully consistent with the plan and sequence of the play, cannot be held to be an alteration, elimination, or addition prohibited under the seventh paragraph without the consent of the author. On the other hand, the author and playwright, by virtue of the contract expressed in the seventh paragraph, is entitled to the exercise of the veto by that paragraph secured, in respect of any part of the motion picture which constitutes, within the intent of the parties, an alteration, elimination, or addition.

To illustrate: The scene in Westminster Abbey, described in Arnold Bennett's "Buried Alive," might very well be a part of a motion picture, although eliminated in the spoken play known as "The Great Adventure." Klein v. Beach (D. C.) 232 Fed. at page 246. Any person, seeing the picture, would realize that such a portrayal of Westminster Abbey would probably not be practicable in the spoken play, and yet the Westminster Abbey scene might very well be not construed as an addition or alteration, because of the reference to it in the dialogue of the play.

In the case at bar the scene of the play is confined to the Chichester house at Scarborough, England. The plot and incidents of the play are so familiar to the litigants and counsel that, in the interest of brevity, it is unnecessary to set them forth in this opinion. Early in the play the fact of the death of Kingsworth, the uncle of the heroine, is made known, and the solicitor also describes the provisions of Kingsworth's will. In the motion picture an imaginary scene is displayed, in which Kingsworth is making his will, and in which Jerry (Sir Gerald Adair), the hero of the play, and the solicitor are present. One of the valuable features of the play is the mystery surrounding Jerry's identity, and the fact that he is one of the executors of the Kingsworth will. This feature of surprise is eliminated from the motion picture, whereas in the play it is well concealed, and the fact that Jerry is an executor does not become known until almost the end of the play.

The question before the court is not whether this order or sequence in the motion picture is as good or better than the order or sequence of the play. The point is that it is such an alteration as, under the seventh paragraph, could not be made without the consent of the author. In the motion picture there would be no doubt in the mind of

the audience from the start as to who Jerry is, and there is very little doubt, if any, as to what will happen. One of the most important factors in any play is the suspense. To attain this method and result successfully involves one of the problems of play writing, and not infrequently a play fails because the audience learns too early what the end will be, and what part or relation each actor bears to the ultimate climax or denouement. This element of surprise has been admirably done in the spoken play by plaintiff, and no doubt was one of the reasons contributing to the remarkable success of the play. A different situation might have been presented, if the play opened in the manner devised by the plaintiff, and if, in the course of the dialogue between the solicitor and the Chichesters, the screen had interpolated a scene showing the making of the will, but eliminating Adair therefrom to such extent, at least, as would not disclose his identity.

In the motion picture the so-called English-Irish controversy is emphasized quite out of proportion to the references in the spoken play. In the play, Peg's references to her father are incidental to a portrayal of her own character and her devotion to her father. The play has no political purpose or significance. In the last analysis, it is a charming, clean love story, with a whimsical, wholesome young girl as the heroine, and a manly, aristocratic young Englishman as the hero. Indeed, plaintiff opens his play book with the quotation:

> "Oh, there's nothing half so sweet in life
> As Love's young dream."

One of the contrasts developed in the play is that of a young girl whose father was of Irish birth, and whose mother was English, and who had lived part of her life in America, suddenly coming to the surroundings of an English home. This contrast is the means of introducing some of the comedy of the play, and, naturally, some of its dramatic interest. In the play the girl comes from America. In the motion picture she comes from Ireland. This departure is adopted probably in order to give opportunity for the picture to display various scenes in Ireland. Some of these scenes are very attractive, especially the peasant scenes, and would, no doubt, be pleasing to the spectator; but most of them are foreign to the theme of the play, and are in no way needed to illustrate the action of the play. Certain pictures are introduced which do not appear in the play and delay the action of the story. One of these is the scene of Peg with her tutor, and the unnecessary introduction of a scene from Antony and Cleopatra.

It is impractical to analyze the motion picture, scene by scene, and compare it with the spoken play. The writer of the scenario evidently had in mind the kind of presentation which pleases the audience of a motion picture play, and to that end departed from the sequential expeditious course of the spoken play. To illustrate that it is not necessary to follow the play literally, I may observe that I should not regard the ballroom scene in the picture as in violation of paragraph seventh. This scene, which forms a pleasant picture, does not detract from the theme or continuity of the story, and, if anything, might be regarded as a helpful illustration.

But the point is that, in view of the fact that the parties contracted as set forth in the seventh paragraph, there cannot be a substantial deviation from the locus of the play or the order and sequence of the development of the plot. If these substantial features are retained, then such pictures as may be necessary to explain the action of the play, and as may be necessary in substitution for dialogue, may be entirely proper, and not in violation of the seventh paragraph. The case is probably sui generis, for doubtless in most contracts the producer will insist upon a reasonably free hand, if he intends to reproduce the play in motion pictures.

For the reason, therefore, that the provisions of paragraph Seventh have not been adhered to, plaintiff is entitled to a decree restraining the production of the motion picture in question.

Submit decree on three days' notice.