[L. A. No. 22094. In Bank. Apr. 29, 1953.]

ARTHUR KURLAN, Appellant, v. COLUMBIA BROADCASTING SYSTEM, INC., (a Corporation) et al., Respondents.

Fendler, Weber & Lerner, Harold A. Fendler and Daniel A. Weber for Appellant.

Aubrey I. Finn, Pacht, Tannenbaum & Ross, Clore Warne, Gordon Stulberg and Maxwell E. Greenberg, as Amici Curiae on behalf of Appellant.

O'Melveny & Myers, Homer I. Mitchell, W. B. Carman and Harned Pettus Hoose for Respondents.

Thelen, Marrin, Johnson & Bridges, Loeb & Loeb, Herman F. Selvin and Harry L. Gershon, as Amici Curiae on behalf of Respondents.

EDMONDS, J.—Arthur Kurlan is suing Columbia Broadcasting System, Inc., and others for damages upon the ground that they copied and used a proposed radio program owned by him. As in *Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947], the appeal is from a judgment entered upon an order sustaining the demurrers of the defendants without leave to amend.

For his first cause of action, Kurlan alleges that Ruth McKenney "originated, created and wrote certain stories for the 'New Yorker Magazine' which were subsequently dramatized in a stage play entitled 'MY SISTER EILEEN,' and which were subsequently used as the basis of a motion picture photoplay also entitled 'MY SISTER EILEEN' featuring the same leading female characters known as 'Ruth' and 'Eileen,' and depicting unique characterizations and relationships between said characters." He states that, by written agreement, McKenney transferred to him "the sole and exclusive right to use for radio broadcasting purposes said leading female characters." She also assigned to him "all radio broadcasting rights" which she had "expressly reserved" in connection with prior licenses and uses of these characters. A further allegation is that, prior to the commencement of this action, McKenney assigned to him all causes of action which she might have against these defendants arising out of transactions alleged in this complaint.

Kurlan then pleads that he "conceived, originated, and devised a new and original radio program idea and original untitled radio program" featuring Ruth and Eileen. In connection with this program, he states, he originated new program techniques and methods of radio presentation, including a new radio production format. These, he says, he "reduced to concrete form and embodied" in a written script and a sample audition recording, at a cost of $10,000, retaining at all times his common law rights of ownership and authorship.

Kurlan states that he submitted his radio program to the defendants at their special instance and request pursuant to

an express oral agreement. In consideration of such submission, if they used all or any part of the program they promised to pay him its reasonable value. The defendants accepted submission of the program script and recording, he states, heard it, and became fully familiar with it. Thereafter, CBS and the other defendants, without Kurlan's authority or license, produced and broadcast over a coast-to-coast network a weekly series of radio programs entitled, "My Friend Irma." This radio broadcast, the complaint continues, substantially copied, used and embodied his radio program idea and format. Kurlan claims general damages of $150,000 for rendering valueless his "personal property."

The second count of the complaint incorporates by reference all of the allegations of the first one except the averments with respect to an express agreement. In addition, it declares that Kurlan submitted his radio program idea and sample audition recording to the defendants at their request for the purpose of sale to or use by them upon payment to him of its reasonable value.

The third count also incorporates by reference all of the allegations of the first one except the averments with respect to an express agreement. It then alleges that Kurlan submitted his radio program idea and audition recording to the defendants at their request pursuant to an implied agreement that, in consideration for the submission, if used by them, they would pay him the reasonable value of the program idea, or any part of it.

After incorporating by reference all of the allegations of the first count except those with respect to an express agreement, the fourth count asserts that the radio program was submitted to the defendants at their request pursuant to trade customs, practices and usages. These customs, the complaint declares, are that the defendants would not use or copy all or any part of his program without his consent and that they would not do or permit any act in derogation of its value.

By reference, all of the allegations of the first count, except those respecting an express agreement, use of the program by the defendants and damages, are made a part of the fifth one. Kurlan then pleads that he submitted his program to the defendants at their request for the purpose of sale to them. They heard the audition recording, he says, and retained it in their possession for several weeks, becoming fully familiar with its contents.

Thereafter, according to the complaint, the defendants negotiated with him for production of a series of radio programs based upon his idea. These negotiations, Kurlan states, were terminated when the defendants informed him that they ''intended to use'' his idea, characters and format ''without compensation therefor by merely changing the names of the characters and describing the leading female characters as girl friends instead of sisters.'' According to Kurlan, the defendants said that by doing so they would save the expense of compensating him and McKenney and own and control the program. Kurlan alleges that he immediately objected to the proposed action and notified the defendants that they would act at their peril.

Thereafter, Kurlan states, with full notice and knowledge of his rights and ''in wilful and deliberate disregard thereof,'' the defendants broadcast over a coast-to-coast network a weekly series of radio programs entitled, ''My Friend Irma.'' These programs substantially copied, used, embodied and misappropriated his ''untitled and unpublished sample audition recording.'' By such conduct, Kurlan says, the defendants ''have appropriated the rights, benefits, royalties and profits to which'' he ''is solely and exclusively entitled,'' and they have destroyed the value of his ''personal property.'' He alleges general damages in the amount of $150,000.

The fifth count includes an allegation that, because of their nature, ''it is not practicable to attach to the complaint'' either Kurlan's audition recording or recordings of the defendants' radio program. The defendants' recordings are in their possession and control, it is said. Kurlan makes profert of his recording and consents that the records which be submitted to the defendants ''shall be deemed to be a part of this complaint for all purposes and upon any demurrer, motion or other proceeding in this cause.'' By stipulation, this allegation was made a part of each of the preceding counts of the complaint.

The defendants demurred to the complaint upon the grounds that each count fails to state facts sufficient to constitute a cause of action. They also moved to require Kurlan to comply with section 426 (3) of the Code of Civil Procedure.

The motion to require compliance with the statute was granted and the records of both radio programs were ordered to be introduced and filed as exhibits on demurrer. Thereafter, demurrers were sustained without leave to amend and

judgment entered ''that plaintiff take nothing as against said defendants.''

This court has studied the scripts and heard recordings of both radio programs. Kurlan's program, ''My Sister Eileen,'' features ''the further adventures of Ruth and Eileen,'' the principal characters ''from Ruth McKenney's best-selling stories and from the Broadway and motion picture hit'' of the same name. The principal idea of the program is to capitalize upon the success of McKenney's creation. As stated in an advertising blurb in the audition script, ''Millions of people have read the Ruth and Eileen stories or seen the play or picture . . . which means that several million dollars worth of some one else's money has already been spent for you, Mr. Prospective Client. . . . These characters have been highly successful in every medium—magazines—books—stage—and screen . . . *but*—as a series have never before been presented on the air . . . the medium for which they are best suited.''

The program may be summarized as follows: Ruth and Eileen are sisters living in an apartment which Eileen found for them in New York City. Ruth possesses average intelligence and capabilities and is the balance wheel of the pair. Eileen is semi-moronic, scatterbrained, impulsive, naive, completely thoughtless and oblivious to the consequences of most of her acts. Lucille Ball, a motion picture actress under contract to Kurlan, plays the part of Ruth.

Ruth, as narrator, introduces a series of incidents in which Eileen's stupidity creates situations extremely embarrassing to Ruth. Ruth is constantly trying to rescue one or both of them from Eileen's scrapes, while Eileen continues to add complications. Through Ruth's efforts, Eileen's situations are turned to the benefit of the pair.

Most of the situations which Eileen creates arise, directly or indirectly, from the fact that Eileen is man-crazy. She trusts any man, and has an astonishing capacity for acquiring large numbers of them in unorthodox ways. This trait introduces certain minor characters into the program, including one dispossessed male who moves in to live with the girls. There is a loud-mouthed Texan boor who, thanks to Eileen, forces his crude attentions upon Ruth. Among other characters are an eccentric old landlady and an ill-tempered canine monstrosity. Ruth's boy friend, Lloyd Carter, is mentioned in the audition recording but his personality is not developed.

The defendants' program, ''My Friend Irma,'' also features two girls, one reasonably intelligent, the other stupid, living

in an apartment in New York City. However, it in no way attempts to capitalize upon the success of McKenney's creation. Jane and Irma are chance friends, not sisters. Jane, for lack of a better place to live, moved into an apartment already occupied by Irma. Marie Wilson, a motion picture and stage actress famous for "dumb-blonde" roles, plays the part of Irma.

Jane, the more intelligent of the two, acts as narrator, introducing a series of incidents in which Irma's stupidity creates situations extremely embarrassing to one or both girls. Jane, however, is totally incapable of coping with the dilemmas posed by Irma's antics. With helpless fascination, Jane watches the unfolding of each new near-catastrophe. Inevitably, in the most improbable and unexpected manner, each situation turns out for the benefit of all concerned.

Irma is a confirmed "one-man girl." Her boy friend, Al, a smooth talking phony, is the third principal character in the show. Al, with his schemes, frequently does as much or more than Irma to create the uncomfortable situations to which the characters are subjected. Jane also is a "one-man girl," very much in love with her socialite businessman employer, Richard Rhinelander III. Richard is frequently the baffled victim of Irma's stupidity and Al's machinations. Minor characters include an avaricious landlady, a burlesque violinist, Richard's mother, and a succession of startlingly unconventional neighboring tenants and friends of Al.

Kurlan contends that his complaint tenders issues of fact with respect to access, originality, similarity and copying and that the trial court erred in deciding these issues upon demurrer. He further claims that each count of his complaint is well pleaded and that the trial court erred in sustaining the demurrers without leave to amend. The 1947 "procedural" amendment to section 426(3) of the Code of Civil Procedure, he says, was not intended to prevent jury trials upon the merits and did not change the "substantive" rule of law that issues of fact shall not be determined upon demurrer or motion.

Another point urged by Kurlan is that the first four counts of his complaint, based upon express and implied contract, state causes of action which cannot be governed by the principles applicable to the tort action of plagiarism. As to the fifth count, he declares that the cause of action will lie for deliberate taking of his idea and format although no literary property is involved.

The defendants contend that, under section 426(3), upon demurrer, the court must examine the alleged infringed and infringing productions and determine whether Kurlan's production is legally protectible property and whether there is any substantial evidence of similarity with respect to such property. In determining the issue of originality, they argue, the court should apply the doctrine of judicial notice. They also contend that the complaint shows upon its face that the literary content of Kurlan's program previously has been published and is, therefore, a part of the public domain. Because no legally protectible material was used by them, they say, the demurrers to each cause of action were properly sustained. In addition, as to the counts upon express and implied-in-fact contract, the defendants assert that the alleged agreement is within the statute of frauds and unenforceable.

The preliminary question here, as in *Weitzenkorn* v. *Lesser, supra,* is: To what actions does section 426(3) of the Code of Civil Procedure apply? Kurlan's counsel does not raise this point in his briefs. However, it appears from the record that the order requiring compliance with section 426(3) was entered over his objection and after argument concerning the question. The general rule is "that ordinarily where a party has neglected to present a point in his brief he may be precluded from insisting that the court consider the point when deciding the case. . . . However, we know of no hard-and-fast rule which prohibits the court from considering and deciding points of law which may not have been urged and argued in the briefs originally filed if it appears to the court that an important legal principle is necessarily involved in the newly discovered point and that a proper disposition of the case requires a discussion and decision of that point." (*Schubert* v. *Lowe,* 193 Cal. 291, 294 [223 P. 550]; *Philbrook* v. *Randall,* 195 Cal. 95, 105 [231 P. 739].)

In *Weitzenkorn* v. *Lesser, supra,* it is held that the statute applies not only to a tort action for plagiarism but also to causes of action for infringement of related contract rights. Therefore, the order of the trial court making the records of both radio programs a part of the complaint affects all five alleged causes of action and a comparison of the productions must be made in considering each count.

Kurlan contends that the statute cannot and does not deprive him of his right to a jury trial of issues of fact with respect to access, originality, similarity and copying. As held in *Weitzenkorn* v. *Lesser, supra,* the statute provides a

method for considering the alleged infringed and infringing productions upon demurrer. This in no way deprives a plaintiff of his right to a jury trial. If, from a comparison of the productions, a question of fact is shown to exist, the cause should be submitted to the jury.

The defendants argue that the court may take judicial notice of the contents of published books and plays and of former and contemporary radio programs in determining whether Kurlan's claim of originality is well founded. For the reasons stated in the Weitzenkorn case, the court cannot do so.

However, Kurland has alleged facts which negative originality as to the major portion of his production. He states that "My Sister Eileen" featuring the characters "Ruth" and "Eileen" and "depicting unique characterizations and relationships between said characters" was originated, created and written by Ruth McKenney for the "New Yorker Magazine." The audition recording which Kurlan has attached to his complaint also states that the story has been published in books. According to the recording, "Millions of people have read the Ruth and Eileen stories."

At the time Kurlan's cause of action arose, section 983 of the Civil Code declared: "If the owner of a product of the mind intentionally makes it public, a copy or reproduction may be made public by any person, without responsibility to the owner, so far as the law of this state is concerned." Section 980 of the same code, as then in effect, provided that, "The author of any product of the mind, . . . has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the product and the representations or expressions thereof made by him remain in his possession."

Kurlan's complaint shows that any property interest which McKenney may have had in either the story or characters of "My Sister Eileen" has been lost by publication. According to the pleader, neither the product of McKenney's mind nor its representations or expressions remain in her possession. Therefore, as a matter of law, there is no protectible property in the "basic dramatic core" of the story, its characters and their relationships, or the form and manner of its expression.

It is suggested, however, that McKenney retained the right to use the characters "Ruth" and "Eileen" in sequels to the original stories. The implication is that no one else could acquire this right. But even if we assume that characteriza-

tions may be protectible, these characters were products of the mind which intentionally had been made public. Under the circumstances, there was nothing to prevent McKenney or anyone else from utilizing them in other productions.

The program incorporated in the complaint declares that it features "the further adventures of Ruth and Eileen." Therefore, we must assume for the purposes of the demurrers that the story is a sequel to, and not a reproduction of, McKenney's literary creation, which is not before the court and the contents of which we cannot judicially notice. Even though the dramatic core of Kurlan's production, together with its two principal characters, their relationships, and its locale, are unoriginal under the allegations of the pleading, neither its style and manner of expression nor its minor characters can be held, upon demurrer, to lack originality as a matter of law. (*Weitzenkorn* v. *Lesser, supra.*)

In addition to his allegation that he created an "original untitled radio program," Kurlan claims to have "devised a new and original radio program idea" for which he "originated, created and devised . . . new program techniques and methods of radio presentation . . . including a new radio production format." In that regard, this case is similar to *Stanley* v. *Columbia Broadcasting System, Inc.,* 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216], and *Kovacs* v. *Mutual Broadcasting System, Inc.,* 99 Cal.App.2d 56 [221 P.2d 108], where the claimed protectible property was a "radio program idea" rather than the traditional conception of "literary property." Under the rules stated and applied in deciding those cases, for Kurlan to have a protectible interest in his radio program idea as reduced to a production format, he must establish both originality and novelty.

Kurlan's radio program idea was to capitalize upon a famous and successful story, play and motion picture by producing it on the radio. The court may take judicial notice of the fact that there is nothing new and novel in this idea which might constitute protectible property. (*Stanley* v. *Columbia Broadcasting System, Inc., supra,* p. 663.) Whether there is any originality or novelty in Kurlan's "new program techniques and methods of radio presentation" is more difficult to determine. There is nothing novel about customary broadcasting techniques, but the court cannot have judicial knowledge of all of the methods of the highly complicated radio industry. It might be possible for Kurlan to show that he created something novel in the way of program techniques and

methods of presentation. Because extrinic evidence is required to prove whether there is any element of novelty in his program techniques, it cannot be determined upon demurrer, that there is no protectible property in them. Insofar as the question of a lack of originality or novelty may be involved in each cause of action, the demurrers could not properly have been sustained solely upon that ground.

The next question for decision is that of similarity. Access and inclination to copy being admitted by the demurrer, then if it may be said that some substantial similarity between the programs reasonably could be found, the issues of similarity and of copying are to be determined by the trier of fact. Having both programs before it upon demurrer in accordance with section 426(3), the court may determine whether there is substantial similarity between them. (*Weitzenkorn* v. *Lesser, supra.*) If, as a matter of law, there is no such similarity, then there is no question of fact and the demurrers to each count of the complaint were properly sustained.

In order for the fifth count of the complaint to state a cause of action for plagiarism, there must be some substantial similarity between the defendants' radio program and protectible portions of Kurlan's production. (*Weitzenkorn* v *Lesser, supra.*) Even if it might be found that there is some originality in the development of minor characters which Kurlan may have added to McKenney's story for the purposes of the radio program, there is no similarity between them and characters in the defendants' program. Nor is there any similarity between the two shows as to the form and manner of expression of their literary content. However, some similarity might be found in the methods of program presentation and radio techniques. Because evidence may tend to prove that Kurlan's program format was both original and novel, the demurrers to the fifth cause of action were improperly sustained.

The defendants strike directly at the heart of Kurlan's other claims by asserting that the complaint charges only the breach of an express, or an implied-in-fact, contract to pay for a "new and original" radio program, if used. They argue that, both from the allegations of the complaint and from the audition program itself, it appears, as a matter of law, that the program is neither original nor novel. Therefore, they say, no cause of action is stated upon an express or implied-in-fact contract.

However, as previously stated, it cannot be determined upon demurrer in the absence of evidence of previously published works that there is nothing original in the literary content of the program or that the radio production techniques utilized lack novelty. Nor may the complaint be construed so narrowly as suggested by the defendants. In substance, it alleges that Kurlan created a new and original radio program which he submitted to the defendants in return for their promise, express or implied, to pay "the reasonable value thereof" if they used it. Although Kurlan has described his production as a new and original program, he does not allege that he represented it to the defendants as such. Also, there is no allegation that the agreement was conditioned upon Kurlan's production's being new and original. The pleading allows Kurlan to present evidence, if there be such, tending to prove a promise, express or implied in fact, to pay for the use of his program whether or not it is original.

For this reason, and in accordance with the rule stated in *Weitzenkorn* v. *Lesser, supra,* the question of protectibility need not be considered in determining the sufficiency of the allegations of the first count of the complaint, based upon express contract. Kurlan may be able to present evidence showing some similarity between the program techniques. In addition, although there is no similarity between protectible portions of the literary content of Kurlan's program and the defendants' broadcasts, there is the possibility of finding some similarity in the use by each production of a "dumb" character who produces difficult situations for a "smart" character, both being girls who share an apartment in New York City. The terms of the contract and the content of the programs present questions of fact for the jury as to the contractual provisions, access, similarity, and copying.

However, the defendants argue that, even if the cause of action upon express contract otherwise is well pleaded, the demurrers to it properly were sustained because the complaint shows on its face that the contract is within the bar of the statute of frauds. Even if it be assumed that the transaction alleged might be said to be a sale of "goods" within section 1624a of the Civil Code, the complaint, upon its face, does not show the bar of the statute. A transaction is removed from the statute by acceptance of part of the goods received. "There is an acceptance of goods . . . when the buyer, either before or after delivery of the goods, expresses by words or conduct his assent to becoming the owner of those

specific goods." (§ 1624a[3].) Kurlan alleges facts from which access, copying and use conceivably could be found. If such findings were made, acceptance of at least a portion of the goods received would be proved and the statute would constitute no bar to the action. Under the circumstances, the facts pleaded in the first count are sufficient to state a cause of action and the demurrers thereto were improperly sustained.

 The second and third counts of the complaint are based upon the common count of *quantum valebant* and are sufficient to state a cause of action upon either a contract implied in fact or one implied in law. (*Weitzenkorn* v. *Lesser, supra.*) As stated in the Weitzenkorn case, "Although it is unnecessary for the pleading to distinguish between the contract implied in fact and the contract implied in law, or quasi contract, the elements which must be proved for recovery upon each of them are quite different." Here, it might be possible for Kurlan to recover upon either a contract implied in fact or one implied in law. Under the first theory, the required proof is essentially the same as that for the count upon express contract, with the exception that conduct, rather than words of promise, must be proved from which the promise may be implied. On the other hand, if Kurlan relies upon a contract implied in law, the proof necessary for a recovery is the same as that required by the tort action for plagiarism. For these reasons, the demurrers to the second and third counts of the complaint should have been overruled.

 The fourth count relies upon a contract implied in fact from trade customs, practices and usages. The conclusions in regard to the count upon express contract are equally applicable to this count and the demurrers thereto were improperly sustained.

These conclusions make it unnecessary to consider Kurlan's contention that it was an abuse of discretion for the trial court to have sustained the general demurrers to all five causes of action without leave to amend.

The judgment is reversed as to each cause of action with directions to permit the defendants to answer.

Gibson, C. J., and Shenk, J., concurred.

SCHAUER, J.—I concur in the judgment and with all that portion of the opinion which is not inconsistent with the views expressed by me in *Golding* v. *R.K.O. Pictures, Inc.* (1950),

35 Cal.2d 690, 710 [221 P.2d 95] ; in *Stanley* v. *Columbia Broadcasting System, Inc.* (1950), 35 Cal.2d 653, 668 [221 P.2d 73, 23 A.L.R.2d 216] ; and in *Burtis* v. *Universal Pictures Co., Inc., post,* p. 823 [256 P.2d 933].

TRAYNOR, J., Concurring and Dissenting.—Plaintiff seeks recovery for the alleged unauthorized use of his plan for a radio program to consist in the serialized presentation of the adventures of two sisters living in a New York apartment. He reduced his plan to concrete form by preparing a script and audition of one sample program and submitted it to defendants. He alleges that they made use of his program by producing "My Friend Irma," and that either under the terms of an express or implied contract, or by virtue of piracy of his literary property, he is entitled to recover damages for such use. The majority opinion holds that he has stated causes of action both for breach of contract and for plagiarism. Since in my opinion plaintiff has not alleged facts, which if proved, would establish infringement of his literary property, I cannot agree with the latter holding.

Plaintiff's program may be divided into three elements. There is the raw material consisting of the two principal characters, the basic relationship between them, and the locale of their adventures. Since this material was taken from the published works of Ruth McKenney, it could in no event constitute protectible literary property under the law of this state. (Civ. Code, § 983.) Accordingly, it is unnecessary to decide whether it constituted merely some of the basic ideas embodied in the program, or would, had it not been previously published, constitute a sufficient development and treatment of basic ideas to be the subject of copyright protection. (See *Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 701 [221 P.2d 95], dissent, and cases and authorities there cited.)

Using McKenney's material, plaintiff produced his sample program in which he presented one adventure of the two sisters. Although he cannot claim copyright protection under the law of this state for McKenney's material or for the ideas he may have added to it, he is entitled to protection for any original treatment and development he has given to such material and ideas. I agree with the holding of the court, however, that insofar as the dramatic content of the sample program is concerned, there is no similarity between plaintiff's original contributions and defendants' program. Such similarity as does exist in this respect arises only from the common

use of the basic dramatic situation found in the McKenney works, and accordingly, will not support a finding of piracy. (*Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 695-696 [221 P.2d 95].)

The third element of plaintiff's program is its basic plan as distinct from the specific episode or adventure presented as a sample or illustration thereof. The plan or format consists of a combination of the following ideas: the use of the McKenney material as the basis for a serialized radio program; the use of first person narration by the intelligent sister to set the stage and bridge the gaps between the scenes in each program; and the use of the principal characters to carry over listener interest from week to week. It may be assumed that this combination of ideas was original with plaintiff. Moreover, although there is nothing new or novel about any one of these ideas, it may be assumed that they had not been combined in the same manner in any earlier radio program. It does not follow, however, that this combination of ideas constitutes protectible intellectual property. The basic program plan adopted as the foundation for a radio serial is analogous to the basic dramatic core or plot of a play or movie. It consists only of the author's general ideas as distinct from his original treatment or development of them. Such general ideas are free and cannot constitute property. (See *Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 701 [221 P.2d 95], dissent; *Stanley* v. *Columbia Broadcasting System, Inc.,* 35 Cal.2d 653, 672 [221 P.2d 73, 23 A.L.R.2d 216], dissent.)

In *Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947], the court holds that since the 1947 amendment to Civil Code, section 980, ideas, as distinct from the original form and manner of their expression, do not constitute literary property in this state. It justifies the protection against plagiarism that was given to the basic dramatic core of plaintiffs' play in *Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690 [221 P.2d 95], and to the radio program idea in *Stanley* v. *Columbia Broadcasting System, Inc.,* 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216], on the ground that "in its earlier form, the statute expressly protected both the idea, the 'product of the mind,' *and* 'the representation or expression thereof.' " Since in the present case the cause of action arose before the statute was amended, the court follows the Stanley and Golding cases in treating plaintiff's radio program idea as protectible literary property.

As it was originally enacted, Civil Code, section 980[1], referred generally to "any product of the mind," and then listed the different types of intellectual property that might exist. Among those listed was "a composition in letters or art," and protection was extended not only to the product itself, that is, to the composition in letters or art, but also to any representation or expression thereof. Thus protection was not limited to the exact literary composition created by the author, but extended to other and different representations and expressions that might be copied therefrom. Under its terms, however, the protection existed only so long "as the product and the representation or expression thereof" remained in the author's possession. It was thus arguable that the common law copyrights in a literary composition might be lost by a transfer of possession of the manuscript even without actual publication.

In 1947 the statute was amended to deal specifically with compositions in letters or art,[2] and the provisions relating to other forms of intellectual property and the limitation with respect to possession were deleted.[3] Thus the amendment made clear that the author's common law copyrights in a composition in letters or art are not dependent upon possession of the composition or its expression or representation, but are only lost in the event of publication as provided in section 983 of the Civil Code. The statute now deals expressly with copyrights as distinct from rights of possession or ownership of the original manuscript itself. (Cf., Civ. Code, § 985.) Neither before nor after its 1947 amendment, however, did section 980 purport to define the extent to which property rights might exist in original ideas as distinct from their treatment and development. An expression or representation of an original composition might consist only in the statement of the general outline of the dramatic core or plot of a play or movie, or in the statement of a general plan for a radio

---

[1] "The author of any product of the mind, whether it is an invention, or a composition in letters or art, or a design, with or without delineation, or other graphical representation, has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the product and the representations or expressions thereof made by him remain in his possession."

[2] "The author or proprietor of any composition in letters or art has an exclusive ownership in the representation or expression thereof as against all persons except one who originally and independently creates the same or a similar composition."

[3] A separate subdivision dealing with other forms of intellectual property was added to section 980 in 1949. (Stats. 1949, ch. 921, § 1.)

program. (*Golding* v. *R.K.O. Pictures, Inc., supra*; *Stanley* v. *Columbia Broadcasting System, Inc., supra*.) Thus, if the Golding and Stanley cases were correctly decided, protection could be extended to the basic dramatic core of a play or the plan of a radio program under the present statute just as it was in those cases under the former.

In my opinion, however, the court properly accepted the concession of the parties in the Stanley case that sections 980 and 983, as formerly worded, were but codifications of the common law. The 1947 amendments to those sections, which antedated the decisions in the Stanley and Golding cases, merely clarified this fact by eliminating the language that might have been interpreted as making the duration of common law copyrights turn on possession rather than publication. Accordingly, the common law rule that ideas are not property, which the court now recognizes (*Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947]), should be applied in this case by holding that plaintiff has not stated a cause of action for plagiarism.

From a comparison of the two programs it cannot be said as a matter of law that defendants have not used plaintiff's radio program idea. Although that idea is not property, it may be protected by an express or an implied-in-fact contract. (*Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947]; *Stanley* v. *Columbia Broadcasting System, Inc.,* 35 Cal.2d 653, 674 [221 P.2d 73, 23 A.L.R.2d 216]; dissent.) Since plaintiff has pleaded counts in both express and implied-in-fact contract, I concur in the judgment to the extent that it reverses the order sustaining the demurrer to those counts.

Spence, J., concurred.

CARTER, J.—I dissent.

I concur in the reversal of the judgment but I cannot concur in the greater part of the reasoning and law propounded in the majority opinion.

It is stated by the majority that ''Kurlan's complaint shows that any property interest which McKenney may have had in either the story or characters of 'My Sister Eileen' has been lost by publication.'' The pleading shows that the story and characters were made public in a play, picture, magazines and books. It also shows that the stories had never been presented on the air and that by written agreement plaintiff's assignor had expressly reserved the sole and exclusive right

to use for radio broadcasting purposes these leading female characters. "The owner of the common-law copyright has a perpetual right of property and the exclusive right of first general publication, and may, prior thereto, enjoy the benefit of a restricted publication without forfeiture of the right of general publication. Thus, he may communicate the contents of his work under restrictions without forfeiture of the right. *This communication of contents under restriction, is known as a restricted or limited publication.*" (Emphasis added; *Bobbs-Merrill Co.* v. *Straus,* 147 F. 15, 18.) "A limited publication of a subject of copyright is one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public. *Abernethy* v. *Hutchinson,* 3 L.J.Ch. 209; *Nichols* v. *Pitman,* 26 L.R.Ch.Div. 374; *Caird* v. *Sime,* 12 L.R.App.Cas. 326; *Tomkins* v. *Halleck,* 133 Mass. 32, 43 Am.Rep. 480; *Palmer* v. *De Witt,* 47 N.Y. 532, 7 Am.Rep. 480; *Turner* v. *Robinson,* 10 Ir.Ch. Rep. 121, 135; *Laura Keene* v. *Wheatley & Clarke,* 9 Am.Law Reg. 33-80, Fed.Cas. No. 7,644." (*Werckmeister* v. *American Lithographic Co.,* 134 F. 321 [69 C.C.A. 553, 68 L.R.A. 591]; Amdur, Copyright Law and Practice, pp. 354-356.)

"It is well settled that the public performance of a dramatic or musical composition is merely a limited publication which does not confer upon the hearer or spectator any title to the manuscript, or any right to a copy which may have been obtained surreptitiously, or which may have come into his possession accidentally; because only a publication of the manuscript will amount to an abandonment of the rights of the author and a consequent transfer of them to the public domain, and *no such publication occurs as long as the author exercises control over his manuscript, or has a right to such control.* (*Crowe* v. *Aiken,* Fed.Cas. 3441; *Keene* v. *Clark,* 5 Robertson (28 N.Y. Super.Ct.) 38; *Keene* v. *Kimball,* 16 Gray (Mass.) 545, 77 Am.Dec. 426; *Brown* v. *Ferris,* 122 Misc. 418, 204 N.Y.S. 190.) Consequently a special public use of it by the author for his own benefit is no evidence of abandonment of his property therein, because such a use is entirely consistent with his exclusive right to its control. Thus, the reading, recital or stage representation of a manuscript play in public for profit, with the consent of the author, does not constitute any evidence of abandonment to the public of any rights arising from the authorship of the play; nor does it deprive him of his right to copyright the play. (*Boucicault* v. *Fox,* 3 Fed.Cas. 977.)

"A ticket of admission merely entitles the holder to witness and enjoy a single exhibition of the play, without conferring upon any member of the public the right to obtain surreptitiously the possession of the original manuscript for subsequent representation for profit, or to reproduce the composition from memory or from notes taken during the performance, in order to share in the earnings of its public presentation. *If the author of a play were not entitled to claim the protection of the law to secure to him the profits · resulting from public performances of his composition, dramatists would soon cease to write plays for the amusement and entertainment of the public, unless subsidized by government or aided by private patronage: for the revenue derived from the sale of published copies of a popular drama would be negligible in comparison with the box-office receipts. (Werckmeister* v. *American Litho. Co.*, 134 F. 321 [69 C.C.A. 553, 68 L.R.A. 591].)

"Where an uncopyrighted and unprinted drama has been publicly performed at a theatre with the author's consent, no unlicensed person has a right to repeat the performance in a public theatre, or to publish copies of the dramatic composition, whether obtained surreptitiously or reproduced from memory after witnessing a performance thereof; *for the author's permission to act it at a public theatre does not amount to an abandonment of his title to it or to a dedication of it to the public; and the proprietor of the exclusive performing rights, or his assignee, by virtue of his common law rights, is entitled to an injunction restraining an unauthorized representation thereof. (Ferris* v. *Frohman,* 223 U.S. 424 [32 S.Ct. 263, 56 L.Ed. 492].)

"Where the intent of the owner is to give the public merely a right to a limited use of his literary property or to use it in a particular way, the owner's act does not constitute an abandonment of all his property; but the *public acquires a right to use it only to the extent of the dedication. (Aronson* v. *Baker,* 43 N.J.Eq. 365, 12 A. 177.)'' (Ball, Law of Copyright and Literary Property, 1944, § 61, p. 135.) (Emphasis added.)

It is common practice to reserve the dramatizing rights on the sale of a book and these rights are respected and upheld by the courts (*Ford* v. *Charles E. Blaney Amusement Co.,* 148 F. 642). Section 1(b) of the 1909 Copyright Act expressly confers upon the copyright proprietor the exclusive right to transform the work by translation, dramatization,

adaptation, and by making other versions embodying material and substantial parts of the original in order to enable the author to reap the profits of his work in every field of intellectual property in which it can be exploited advantageously by vending copies or by public performance for profit (*O'Neill* v. *General Film Co.,* 157 N.Y.S. 1028). This section has been literally construed by the courts to cover any adaptation of a literary work which tells the same story as the original, whether the resulting drama be adapted for presentation in the form of a stage play or for exhibition on the screen (*Kalem Co.* v. *Harper Bros,* 222 U.S. 55 [56 L.Ed. 92, Ann.Cas. 1913A 1285]; *International Film S. Co.* v. *Affiliated Distributors,* 283 F. 229).

For the purpose of the demurrer, all allegations of the complaint must be taken as true. It is alleged in the complaint here that on or about the 11th day of March, 1946, Ruth McKenney and plaintiff entered into an agreement in writing, wherein Ruth McKenney did grant to plaintiff the sole and exclusive right to use for radio broadcasting purposes the leading female characters created by her and featured or portrayed in "said stories, stage play and motion picture entitled '*My Sister Eileen*,' and said Ruth McKenney did furthermore grant to said plaintiff Arthur Kurlan all radio broadcasting rights therein and thereto *which had theretofore been expressly reserved by said Ruth McKenney in connection with each and all of said prior licenses and uses of said characters in connection with said stories, play and motion picture hereinbefore mentioned.*" (Emphasis added.) It is further alleged that after the expiration of the original term of the agreement the time was extended by the parties, Ruth McKenney and plaintiff; that Ruth McKenney reserved and retained the right to receive royalties in connection with the production of any and all radio programs licensed under the agreement. Hence, plaintiff's assignor reserved all radio rights in the two leading characters, and it cannot be true, as is stated in the majority opinion, that "as a matter of law, there is no protectible property in the 'basic dramatic core' of the story, its characters and their relationships, or the form and manner of its expression" because there has been a publication. The allegations of the complaint show that the publication was a limited one with certain rights reserved.

It has been recognized that different types of rights may be reserved in literary works and that publication may be restricted so as to preserve those rights. (See *Manners* v. *Famous*

*Players-Lasky Corp.*, 262 F. 811; *L. C. Page & Co.* v. *Fox Film Corp.*, 83 F.2d 196; *Gogniat* v. *Universal Pictures Corp.*, 35 U.S. Pat.Q. 117; *Casino Productions* v. *Vitaphone Corp.*, 163 Misc. 403 [295 N.Y.S. 501]; *Society of European S.A.A.C.* v. *New York Hotel Statler Co.*, 19 F.Supp. 1; *Gillette* v. *Stoll Film Co.*, 120 Misc. 850 [200 N.Y.S. 787]; *Benelli* v. *Hopkins*, 198 Misc. 734 [103 N.Y.S.2d 526]; *G. Ricordi & Co.*, v. *Paramount Pictures*, 189 F.2d 469, cert.den. 342 U.S. 849 [72 S.Ct. 77, 96 L.Ed. 641].)

At the time Kurlan's cause of action arose, § 980 of the Civil Code provided protection for "any product of the mind . . . *and* in the representation or expression thereof." (Emphasis added.) The majority says, however, that the two leading characters involved were unoriginal and unworthy of protection inasmuch as any property right in them had been lost by publication. As I have heretofore stated, it is my opinion that the publication was a limited one, with the radio rights expressly reserved and that there was a protectible property interest involved. The statute reads, for our purposes, as it did when this court decided *Golding* v. *R.K.O. Pictures, Inc.*, 35 Cal.2d 690 [221 P.2d 95], wherein a basic, dramatic core with one important dramatic figure was held to constitute a protectible interest.

Characters and characterizations which are products of the mind *should* be held to be protectible property interests. The radio industry is a large one, and radio programs are frequently based upon a single character, personality or characterization. To illustrate the extremely valuable theatrical-radio properties which are in existence one only must look as far as the radio column in his daily paper to note the programs, built around a single character, or family, which continue from day to day, week to week, and year to year.* It should be apparent to even the least intelligent that these programs are as valuable as the most gilt-edged security listed on the Stock Exchange. No court would hesitate to extend its protection to the lawful owner of a security, and yet equally

---

*Sherlock Holmes; The Thin Man; The Fat Man; Michael Shane; Count of Monte Cristo; Crime Doctor; The Whistler; Mr. District Attorney; A Date with Judy; Adventures of Bulldog Drummond; Adventures of Ellery Queen; Adventures of the Falcon; Jack Armstrong; Blondie; Captain Midnight; The Lone Ranger; Stella Dallas; Ma Perkins; The Great Gildersleeve; Perry Mason; Superman; Young Dr. Malone; The Cisco Kid; Fibber McGee and Molly; Mr. and Mrs. North; One Man's Family; The Aldrich Family; Amos 'n' Andy; Edgar Bergen and Charlie McCarthy; Burns and Allen; and many others.

valuable "character-types" are not given the same protection. It is surely a subject of judicial notice that California is the center of the motion picture industry of the world and if its laws are inadequate for the protection of the individual creative writer who must find a market for his work, then those laws should be amended. It is axiomatic that the movie industry could not exist without the writer and yet, if the present trend continues, the writer will vanish from the scene. The same is true of the radio industry. A writer submits his work to either industry in the hope and rightful expectation that if his work is used, he will be paid its value, but, under presently existing conditions, and court decisions, these industries may make minor changes in the play, or manuscript, and escape liability and any obligation to pay any consideration therefor. As Goldsmith wrote (Enquiry into the Present State of Polite Learning) as an epitaph to the memory of his friend, Ned Purdon, an author:

"Here lies poor Ned Purdon, from misery freed,
Who long was a bookseller's hack;
He led such a damnable life in this world,
I don't think he'll wish to come back!"

The statement attributed to *Stanley* v. *Columbia Broadcasting System, Inc.*, 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216], found in the majority opinion here is misleading so far as this case is concerned. That statement is "Kurlan's radio program idea was to capitalize upon a famous and successful story, play and motion picture by producing it on the radio. The court may take judicial notice of the fact that there is nothing new and novel in this idea which might constitute protectible property." We said there that there was "nothing new in a play broadcast over the air." There is nothing new in a play broadcast over the air, but there is something new in a play broadcast by someone else over the air for the first time *if* the author of that play has reserved the radio rights thereto, because the play is being used in a medium new to it. The Stanley case was not concerned with the broadcasting rights in a play; it was concerned with a combination of ideas which was being used for the first time in a certain way and the originator of that combination of ideas, with the permission of the author of the new play, was suing the broadcasting system.

Section 426(3) of the Code of Civil Procedure now provides that the copy of the production as to which the infringement is claimed and a copy of the alleged infringing produc-

tion must be attached to the complaint. This permits the trial court, upon demurrer, to decide in the first instance whether or not there is similarity between the two productions. Heretofore, the question of similarity has been considered to be one of fact (*Stanley* v. *Columbia Broadcasting System, Inc.*, 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216]; *Golding* v. *R.K.O. Pictures, Inc.*, 35 Cal.2d 690 [221 P.2d 95]; *Kovacs* v. *Mutual Broadcasting System, Inc.*, 99 Cal.App.2d 56 [221 P.2d 108]; *Frankel* v. *Irwin*, 34 F.2d 142; *Twentieth Century-Fox Film Corp.* v. *Dieckhaus*, 153 F.2d 893), and the test to be that impression received by the average reasonable man upon a comparative reading of the two works. There should be no change in the test to be used under the new code section. It should still be that of the reasonable man. In other words, *if reasonable minds could differ as to whether or not there is similarity between the two works, then the question is still one of fact for the jury.*

In the play "My Sister Eileen," Ruth, as narrator, is a young, attractive, intelligent working girl who is the unwilling victim of a succession of difficulties created by her sister, Eileen, with whom she lives because "apartments are hard to find in New York." Ruth is the balancewheel for her completely thoughtless, impulsive, scatterbrained sister, Eileen. Eileen is hopelessly unable to hold a job and has had six of them within four months. She has no financial sense and never has any money because she spends every cent she has on "junk" which everybody seems to be able to sell her. She uses the common exchequer and family funds without Ruth's knowledge or consent and makes life unbearable for Ruth with her scatterbrained schemes; embarrasses Ruth by ridiculous lies told without malice or intent to creat mischief but with every desire to help her sister and roommate. Ruth and Eileen are from Ohio. Ruth has acquired some city "sophistication" while Eileen has not and remains completely naive. Ruth's supposed fiancé, Claude, is described as a blustering "braggart," but she is in love with a serious, intelligent businessman, Lloyd Carter.

Jane, in the radio production "My Friend Irma," as narrator, is a serious, intelligent working girl from Wyoming who has acquired a certain amount of city "sophistication." She lives with her "friend Irma" because apartments are "hard to find these days." Jane is in love with a serious, intelligent businessman, Richard Rhinelander III. Irma is gay, careless,

impulsive, thoughtless and completely lacking in sophistication; she causes Jane endless difficulties because of her scatterbrained schemes. Irma's boy friend, Al, is described as a "phony windbag." In this program, as in the play "My Sister Eileen" there is an eccentric landlady.

In conjunction with the similarities just set forth, attention is called to the summary of the two productions as set forth in the majority opinion. It cannot be said, as a matter of law, that there is no similarity between the two. The briefs show that in describing the radio program entitled "My Friend Irma," the New York Herald-Tribune, on March 22, 1948, stated in a dramatic criticism and review of the program: "The *central idea,* that of two young girl roommates, one bright, the other one almost intolerably innocent of all knowledge, was *taken almost intact from a very funny play entitled 'My Sister Eileen.'*" (Emphasis added.) The question of similarity between the two productions is most assuredly one on which reasonable minds might differ as can be seen from the above quoted dramatic review and the fact that three justices of the District Court of Appeal (see (Cal.App.) 233 P.2d 936) as well as myself feel that within the common knowledge of the average reader, observer, spectator or listener there are sufficient similarities to induce the belief that copying has taken place. It is true that there are differences between the two programs, but as Mr. Justice Edmonds said in the Golding case "such differences go to the quality of the plagiarism, and not to its existence or nonexistence." (*Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 699 [221 P.2d 95].)

No test other than the reasonable minds one has ever been laid down for determining the question of similarity between the alleged infringed and infringing productions and there is no reason why, in determining the matter upon a demurrer, the trial court should apply any other rule. As I read the majority opinion in this case and in that of *Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947] (this day filed) I do not find that any test has been proposed other than that of "substantial similarity." In *Weitzenkorn* v. *Lesser, supra,* it is said "if some substantial similarity between the compositions reasonably could be found, the issues of similarity and of copying are to be determined by the trier of the fact" and in the instant case it is said that "If, from a comparison of the productions, a question of fact is shown to exist, the cause should be submitted to the jury." In my opinion, these statements are not the equivalent of saying that the question is

one for the jury if reasonable minds could differ on whether or not the two productions are similar.

I would reverse the judgment with directions to the trial court to overrule the demurrer as to all counts and permit defendants to answer if they be so advised.

Appellant's petition for a rehearing was denied May 28, 1953. · Carter, J., and Spence, J., were of the opinion that the petition should be granted.